IN THE MATTER OF GEORGE LINCOLN EDSON, AN
ATTORNEY AT LAW.

Argued May 4, 1987—Decided September 25, 1987.

*Thomas J. McCormick,* Deputy Ethics Counsel, argued the cause on behalf of Office of Attorney Ethics.

*John L. Call, Jr.,* argued the cause for respondent (*Mathews, Sitzler, Weishoff & Sitzler,* attorneys; *John L. Call* and *John S. Sitzler,* on the brief).

PER CURIAM.

The disciplinary infractions charged in these proceedings grow out of a calculated course of reprehensible conduct. The evidence in support thereof is devastating and largely irrefutable. No judicial response short of disbarment can be considered acceptable.

## I

Respondent, George L. Edson, was charged by the District IIIB Ethics Committee (local committee or DEC) in a two-count complaint. Each count accused respondent of fabricating an extrapolation defense in a prosecution for violation of *N.J.S.A.* 39:4–50, driving while intoxicated (a defense since rendered invalid by *State v. Tischio,* 107 *N.J.* 504 (1987)). The first count concerned motor vehicle charges brought on August 18, 1984, against respondent's client Joseph P. Hoppe, Jr.; and the second count involved similar charges allegedly arising out of an incident of October 15, 1985, against one Army Major Frank Furillo, who in reality was Burlington County Detective Captain Neil Forte posing as a client.

### –A–

The evidence before the DEC in the Hoppe matter revealed that when stopped at 5:30 a.m. by a state trooper, Hoppe stated that he had consumed four drinks of scotch and soda between 10:00 p.m. and 2:00 a.m. That information is included in the arresting officer's Alcohol Influence Report. Two breathalyzer tests conducted at 6:10 a.m. and 6:19 a.m. produced blood-alcohol readings of .14%. Hoppe retained respondent to defend him on the resultant driving-while-intoxicated (DWI) charge, told him about the four drinks, and said that he had consumed them at Kelly's bar in Wrightstown, after which he went to the Satellite Lounge in New Hanover, where he drank nothing alcoholic. Hoppe left the Satellite at about 5:30 a.m. and was arrested shortly thereafter.

According to Hoppe, respondent told him that the facts as related afforded no basis for an adequate defense. Although Hoppe wanted to tell the truth, Edson told him that "[t]he way the real world is, is that [the police] lie and you lie back." Respondent sought to implement that advice by counselling

Hoppe to manufacture a story that in addition to the four scotches at Kelly's, he "chugged" a Zombie (containing about three ounces of Puerto Rican rum, one ounce of apricot brandy, and one ounce of Jamaican rum) at the Satellite at about 5:15 a.m.

The purpose of this fabrication was to form the basis for an extrapolation defense, that is, to demonstrate that the .14% reading overstated the actual blood-alcohol level at the time of the arrest. That demonstration would require expert testimony to the effect that based on the "facts," Hoppe's blood alcohol at the time of arrest was actually between .06% and .09%. To fulfill that purpose respondent directed a letter, dated December 5, 1984, to an alcohol expert, in which the Zombie was added to the list of drinks included in Hoppe's factual recitation. The DEC concluded, and we agree, that the clear discrepancy between the four scotches reported to the arresting officer and the Zombie, which first appears in the letter to the alcohol expert, gives credence to Hoppe's assertion that this basis for an extrapolation defense originated with Edson.

Before the Hoppe DWI case went to trial, respondent was able, on the basis of the manufactured drinking pattern and the expert's report, to obtain the consent of the municipal prosecutor and the arresting officer and the acquiescence of the municipal court judge to a plea-bargained reduced charge of reckless driving.

Hoppe rejected the plea arrangement. The case therefore went to trial, with a full extrapolation defense being introduced both through defendant's version, which included the fictitious Zombie, and the expert's testimony. Defendant was convicted and the conviction was upheld in the Law Division. In his application for a new trial Hoppe filed a certification asserting that Edson manufactured the "Zombie-extrapola-

tion" defense and requested leave to re-enter his original defense based on his having consumed four drinks of scotch before 2:00 a.m.

Although respondent denied planting the "Zombie" business in Hoppe's story, the DEC concluded that "the entire set of facts and circumstances surrounding the Zombie and the extrapolation defense were created" by Edson. Moreover, the local committee characterized the letter to the alcohol expert as "a deliberate attempt by the Respondent to present false information in support of his client's defense."

–B–

Based on the information given by Hoppe in support of his application for a new trial the Burlington County Prosecutor's Office commenced an undercover investigation of the respondent.

On October 10, 1985, as part of that investigation, Captain Neil Forte, a Burlington County Detective, went to Edson's office purportedly to confer about a drunk-driving summons issued to him in Medford Township. Forte, who was equipped with a sound monitoring device, presented himself as Army Major Frank Furillo, for whom a DWI conviction would beget ruinous consequences for his military career.

Furillo told Edson that he had had a few "seven and sevens" at Nicklebees in Medford, stopped drinking for an hour or so, had a hamburger and some coffee, and then left the restaurant, immediately after which he was stopped by the Medford police. (The cognoscenti will appreciate the thought the prosecutor's office must have put into this drinking-and-eating pattern, inasmuch as it rendered impossible any sensible extrapolation defense.) Respondent's reaction to this recitation, within five minutes of his meeting this complete stranger, was to begin laying the groundwork for an extrapolation defense, necessary because according to Edson the "true" facts were "ruinous."

"That's gonna kill you. If you hadn't drank for an hour, you have no chance of winning this."

As disclosed by the taped conversation respondent first ascertained that Furillo had not told the arresting officer either when he had started or when he had stopped drinking, or that an hour before he was arrested he had stopped drinking liquor and drank some coffee. Edson's response, direct and to the point, albeit somewhat coarse, was

> That's good. Because if you said you had waited an hour you would have been fucked. It's as simple as that. There's no extrapolation possible.

Respondent then went on to explain the extrapolation defense to the "client":

> Edson  I'm just trying to figure out a way to pose your drinking pattern here.
>
> Furillo-Forte  How does that work, like in an hour it would have burned off if I didn't have a drink or * * *.
>
> Edson  Well see the only way, in New Jersey if you're a .10 you're mandatorily guilty unless I can prove by extrapolation.
>
> Furillo-Forte  I don't, I don't really understand this.
>
> Edson  Extrapolation if I have a 12 ounce tumbler of scotch right here. I chug the entire 12 ounces right now.
>
> Furillo-Forte  Right.
>
> Edson  I get in my car and run the stop sign at the end of the street, smell the booze on me, they process me. Like you they pull you over at 11:03 and they don't give you a test till 11:45, forty-five minutes later. Well forty-five minutes later the majority of that alcohol is absorbed into my blood stream providing I didn't drink probably all of it, providing I didn't eat all of it, providing I did eat, maybe two thirds of it okay.
>
> Furillo-Forte  Oh I see what you're saying.
>
> Edson  Now my argument is the time he pulled me over, 11:03, it wasn't in my system. I wasn't a .10. Okay. Although at the time of testing I was.
>
> Furillo-Forte  Oh okay.
>
> Edson  Okay?
>
> Furillo-Forte  Okay.
>
> Edson  That's what called extrapolation. Fortunately you didn't say I waited an hour and had coffee and everything else to the cop. An[d] you couldn't extrapolate that reading. But see I don't know. It's just a matter of, you can use any suggestion you want and I'm gonna have to, right now I'm calculating a reason for you to figure out what kind of drinking pattern you have. Understand?
>
> Furillo-Forte  Okay.

Respondent then proceeded to concoct a series of facts included in which were a recent marital dispute and some drinks called "Long Island Iced Tea" (each containing three shots of liquor), which, according to respondent's proposal, were consumed hastily just before Furillo left the tavern. To fix this imaginative scenario in Furillo's memory Edson gave his "client" a written memorandum of the revised facts.

As the DEC found, the strategy, as in the Hoppe case, was to persuade the prosecutor and the arresting officer to recommend a downgrade to a reckless driving charge. The approach was to be on two fronts: Furillo to appeal to the sympathies of the arresting officer and give him the "Iced Tea" story, and respondent to feed the same information to the municipal prosecutor. As the DEC's report points out:

> It is significant that the thrust of the Respondent's invented defense was to arrange a settlement without the need for perjured testimony. [As disclosed by the tape recording] the Respondent tells Furillo: "You don't have to say anything. I'll do that for you."

On the following day respondent telephoned the municipal prosecutor, whose return call was monitored. Respondent conveyed the manufactured story, and at the same time he tried out the extrapolation defense, the reaction to which was that it sounded like a good absorption situation. The municipal prosecutor agreed to discuss the circumstances with the arresting officer. For his part Furillo communicated to respondent the decidedly unsympathetic attitude of the arresting officer, who had refused to accept the "client's" apology. The municipal prosecutor thereafter confirmed to respondent the arresting officer's unrelenting frame of mind. Respondent therefore told Furillo by telephone (again recorded) that their strategy had failed, that he could not assist Furillo, and that Furillo should seek other counsel.

–C–

The DEC concluded, as do we, that the most persuasive part of the presentation against respondent is found in the Forte-Fu-

rillo undercover work. The DEC found the record "quite clear in showing that Respondent deliberately created facts to support a defense," and observed that "[n]o justification was offered in the face of the transcripts and tapes."

On the Hoppe matter the local committee confronted directly the respondent's denial that he suggested that Hoppe change his story to include the Zombie. As the DEC pointed out,

[i]t is clear, however, that Hoppe's story changed to include the Zombie after he met the Respondent. ([Exhibit] C–3 Alcohol Influence Report—no Zombie; C–4 letter from Respondent—Zombie). This is perfectly consistent with the Respondent's approach to Furillo; viz., a powerful drink rapidly consumed just prior to the arrest. The panel acknowledged that Hoppe is not a good witness. His story gains credence when viewed against the backdrop of Furillo, however, and the panel accepts that portion of his testimony relating to the Zombie.

The DEC's particularly well-formulated report reached the conclusion that respondent's conduct was "clearly unethical" in that:

a. He counselled Mr. Hoppe to fabricate a defense involving material facts that were knowingly false. (RPC 1.2(d))

b. He participated in the fraud by giving information known to be false to an alcohol expert (RPC 8.4(a)(b)(c)(d)).

c. He participated as defense counsel while Hoppe perjured himself in municipal court. (RPC 3.3(a)(4) and 3.4(b)).

d. He manufactured a defense for undercover agent Forte posing as Frank Furillo. (RPC 8.4(a)(b)(c) and (d)).

e. He counselled Furillo to lie to an arresting officer (RPC 1.2(d)).

f. He personally lied to prosecuting attorney. (RPC 8.4(a)(b)(c) and (d)).

## II

The Disciplinary Review Board (DRB), after reviewing the full record, agreed with the conclusion of the local committee that respondent's unethical conduct had been established by clear and convincing evidence. Indeed, at the hearing before the DRB respondent did not contest the findings and conclusions reached by the local committee. Specifically, the DRB found, and we agree, that

the record is clear that respondent advised two clients to manufacture evidence in the defense of their drunk driving cases, contrary to RPC 1.2(d). Respondent also knowingly permitted a client to offer false evidence in a trial, contrary to

RPC 3.3(a)(4), and counseled and assisted a witness to testify falsely in a trial, contrary to RPC 3.4(b). Respondent also participated in a fraud by giving false information to his expert witness for the purpose of having him testify under oath in reliance upon those facts, and he gave false information to a municipal prosecutor, contrary to RPC 8.4(a), (b), (c), and (d).

As the DRB observed, respondent "detracted materially from the honesty, integrity, and dignity that are the hallmarks of the legal profession" (quoting *In re Mintz*, 101 *N.J.* 527, 536 (1986)). Labelling respondent a "liar for hire," the DRB pointed out that "[r]espondent planted the seeds of deception;" that "[h]e, himself, would commit the deceit;" and that "[c]lients who might have some scruples about personally lying in their defense could engage respondent, who had no qualms about lying." The DRB report continues:

This misconduct tears the very delicate threads of our legal system. Our system is not based on lies and deception but on truth and honor. An officer of the court should be able to rely on the representation of another officer of the court. An attorney "must, at all times, uphold and honor the law" (quoting *In re Mintz, supra,* 101 *N.J.* at 536).

A five-member majority of the DRB recommended that respondent be suspended from the practice of law for three years. A four-member minority, finding that the "underlying misconduct itself constitutes irrefutable evidence of a profound lack of professional good character and fitness" (quoting *In re Templeton,* 99 *N.J.* 365, 376 (1985)), recommended that respondent be disbarred. Before this Court the Office of Attorney Ethics (OAE) argues for disbarment. As indicated at the beginning of this opinion, our independent review of the record convinces us that disbarment is the only appropriate discipline.

The majority in the DRB, however, was apparently dissuaded from recommending disbarment on the strength of this Court's decision in *In re Rosen,* 88 *N.J.* 1 (1981). But our opinion in *In re Verdiramo,* 96 *N.J.* 183 (1984), casts doubt on whether, had *Rosen* come up after *Verdiramo,* it would have been decided the same way, see 96 *N.J.* at 186–87; for although *Rosen* bears factual similarities to this case (there, a criminal conviction of two counts of attempted subornation of perjury, respondent suspended for three years), we gave unmistakable warning that

henceforth "ethical misconduct * * * involving the commission of crimes that directly poison the well of justice [ ] is deserving of severe sanctions and would ordinarily require disbarment." 96 *N.J.* at 186 (citing *In re Hughes,* 90 *N.J.* 32 (1982)).

It is of no moment that in this case the Burlington County Prosecutor did not seek an indictment, exercising his judgment in favor of letting the lawyer disciplinary process run its course, wherefore respondent is not burdened, as Rosen was, with a criminal conviction. Nor need we rest our decision on the fact that despite the absence of a conviction, respondent was surely guilty of criminal conduct (in the Hoppe matter the OAE lists, with persuasive force, aiding and abetting the commission of perjury, in violation of *N.J.S.A.* 2C:28–1 and *N.J.S.A.* 2C:5–1(c); conspiracy, in violation of *N.J.S.A.* 2C:5–2(a) and (b); and furnishing false information to an expert witness with the purpose of misleading the municipal court judge, contrary to *N.J.S.A.* 2C:28–6(2); and in the Furillo-Forte case conspiracy, in violation of *N.J.S.A.* 2C:5–2(a) and (b)), for Edson's unethical conduct alone is sufficient to warrant disbarment. *Cf. In re Rigolosi,* 107 *N.J.* 192 (1987) (despite acquittal of criminal charges of conspiracy, bribery, and related charges, respondent disbarred for conduct involving dishonesty, fraud, and deceit, prejudicial to administration of justice).

One need but listen to the tapes. The reaction to what is portrayed is at once fascinating and chilling. The members of this Court are not babes in the woods. We are invested with at least minimally acceptable levels of sophistication, of worldliness. Our professional backgrounds have exposed us, in varying degrees, to some of life's seamier aspects. We have travelled different roads in our professional careers. We practiced in different fields and encountered, collectively, all kinds of lawyers—most very good, some perhaps indifferent, and a mere handful bad. In short, we have been around enough that not much surprises us. But rarely have we encountered in our colleagues at the bar the kind of shocking disregard of professional standards, the kind of amoral arrogance, that is illustrat-

ed by this record. There could hardly be a plainer case of dishonesty touching the administration of justice and arising out of the practice of law.

As we observed in *In re Wilson*, 81 *N.J.* 451, 455 (1979), the bond of trust so essential to the legal profession is

built on centuries of honesty and faithfulness. Sometimes it is reinforced by personal knowledge of a particular lawyer's integrity or a firm's reputation. The underlying faith, however, is in the legal profession, the bar as an institution.

And as we have recently declared, members of the bar

must possess a certain set of traits—honesty and truthfulness, trustworthiness and reliability, and a professional commitment to the judicial process and the administration of justice. These personal characteristics are required to ensure that lawyers will serve both their clients and the administration of justice honorably and responsibly.

[*Application of Matthews*, 94 *N.J.* 59, 77 (1983).]

That respondent chose to turn his back to these demands of the profession could scarcely be demonstrated more dramatically than it is by the record in this case.

Respondent is disbarred. In addition, he is to reimburse the Ethics Financial Committee for appropriate administrative costs.

So ordered.

## ORDER

It is ORDERED that GEORGE L. EDSON of WRIGHTS-TOWN, who was admitted to the bar of this State in 1980, be disbarred from the practice of law; and it is further

ORDERED that GEORGE L. EDSON reimburse the Ethics Financial Committee for appropriate administrative costs; and it is further

ORDERED that GEORGE L. EDSON be permanently restrained and enjoined from practicing law; and it is further

ORDERED that GEORGE L. EDSON comply with Administrative Guideline Number 23 of the Office of Attorney Ethics dealing with disbarred attorneys.

WITNESS, the Honorable Robert N. Wilentz, Chief Justice, at Trenton, this 25th day of September, 1987.

*For disbarment* —Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*Opposed* —None.