570 A.2d 940
IN THE MATTER OF THOMAS A. LUNN, AN
ATTORNEY AT LAW.

Argued January 3, 1990—Decided March 16, 1990.

*Paula T. Granuzzo,* Deputy Ethics Counsel, argued the cause on behalf of Office of Attorney Ethics.

*Harry D. Ambrose, Jr.,* argued the cause for respondent.

PER CURIAM.

This disciplinary proceeding arises out of a presentment filed by the District IV Ethics Committee (DEC), which concluded that respondent had committed unethical conduct.  The Discipli-

nary Review Board (DRB) agreed that respondent engaged in unethical conduct that violated *DR* 1–102(A)(4), *DR* 1–102(A)(5), *DR* 7–102(A)(5), and *DR* 7–102(A)(6).[1] The DRB unanimously recommended that respondent be suspended from the practice of law for one year.

I

Respondent was admitted to the bar in 1959. He has not been the subject of prior discipline. Throughout his career his practice consisted primarily of personal-injury litigation on behalf of both plaintiffs and defendants.

This disciplinary matter concerns respondent's conduct with respect to a personal injury action brought on his own behalf. The suit arose from a visit respondent, his wife Sylvia, and teenage son made on April 27, 1980, to a casino in Atlantic City. The Lunns had dinner at one of the casino's restaurants and walked around the casino. Respondent alleges that while leaving the casino, he sustained personal injuries when an escalator to the parking garage came to a sudden and unexpected stop. Another passenger, J.F., also claimed injury as a result of the sudden stop. The casino did not make a record of the accident and neither party reported the accident to the casino.

Mrs. Lunn died in August of 1980. By letter dated April 2, 1982, respondent wrote to the casino's insurance company and enclosed a handwritten statement that he referred to "as a statement of my wife Sylvia P. Lunn which sets forth basically how the incident occurred."

On April 22, 1982, respondent filed a suit in Superior Court against the casino and the manufacturer of the escalator,

[1] Effective September 10, 1984, the Rules of Professional Conduct of the American Bar Association, as modified by this Court, govern the conduct of the members of the bar of this State. *R.* 1:14. Respondent's actions occurred prior to this date, and are consequently governed by the Disciplinary Rules then in force.

claiming damages for his injuries from the escalator incident. He also filed suit on behalf of J.F. and her husband. Respondent later withdrew as counsel for J.F. and also obtained counsel for himself.

In the course of the litigation respondent answered interrogatories propounded of him by the defendants. He responded to question twenty-one, which inquired whether he had obtained any statements concerning the incident, as follows: "Yes. Statement from my wife and son have been supplied to defendants' insurance company and I assume defendants." Respondent certified that the statements made in answer to the attached interrogatories were true.

As the DRB accurately sets forth in its Decision and Recommendation, respondent was asked at least five times during his deposition about the statement purportedly signed by his wife:

Respondent first identified his handwritten statement as follows:

A. Yes, this appears to be the statement of information that my wife supplied and, you know, I think that your insurance company got it.

Q. The Exhibit W-1 is a statement of April 30, 1980 by Sylvia P. Lunn; is that correct?

A. Yes.

Q. Okay.

A. To the best of my knowledge.

\*       \*       \*       \*       \*       \*       \*       \*

Later, in response to specific questions, respondent testified that he could picture his wife sitting at the dining room table and writing out another statement. *Id.* at 62. Subsequently, the following occurred:

Q. Mr. Lunn, what's been marked W-1, that is your wife's statement—

A. Yeah.

Q. She wrote that out; is that correct?

A. Yeah.

\*       \*       \*       \*       \*       \*       \*       \*

Thereafter, on page 132 of Exhibits EC-10 in Evidence, the following occurs:

Q. —now, sir, after this incident, two statements were prepared by your wife and your son. Is that true, sir?

A. Yes, because, as I mentioned previously, when—well, you know, I knew that I—I thought that somebody would probably contact me from Bally....

\*       \*       \*       \*       \*       \*       \*       \*

**166**

Q. Okay. Let me ask you first about W-1, which is a two page document. Did Sylvia herself write that out, sir, physically write it out? [or] did she dictate that to somebody or did she tell somebody else and they wrote it down. Did she physically write that?

A. Well, to the best of my recollection, you know, as I've indicated to you, this was written, signed by my wife in our dining room after we discussed, you know, preparing some sort of a memo or statement or whatever concerning this incident.

Q. Okay. Whose idea was it to prepare such memos?

A. Mine.

Q. Let me ask you this: you, of course, were married to your wife for a great number of years. Are you familiar with her handwriting?

A. Yes.

Q. Is that her handwriting on W-1?

A. As I've testified, yes.

Despite several opportunities to admit that he had written and signed his wife's purported statement, respondent persisted in the lie that his wife had written and signed the statement. As the litigation proceeded, it became evident that defendant's counsel suspected that Sylvia Lunn had not written the statement. On June 6, 1983, defendants obtained an order from the Superior Court, requiring Mr. Lunn to provide cancelled personal checks signed by Sylvia Lunn. Respondent did not comply with the order. On July 20, 1983, defendants obtained a second order from the Superior Court, expressly providing that if Lunn failed to provide the required material, his complaint would be dismissed. Rather than provide the material, respondent voluntarily dismissed the complaint with prejudice.

In late 1983, defendants' counsel communicated with the Camden County Prosecutor's Office concerning the validity of Sylvia Lunn's statement and respondent's lawsuit. On May 2, 1984, respondent made a statement to the prosecutor's office and admitted that, despite his testimony at the deposition, he knew at the time of the deposition that he "had written the body of, and signed the name of Sylvia P. Lunn to the document" discussed in his testimony. The prosecutor's office then referred the matter to the Ethics Committee.

## II

Respondent's unethical conduct is established by clear and convincing evidence. It is now undisputed that Sylvia Lunn's statement was written and signed by respondent. Accordingly, his representations in his letter to the insurance carrier, his sworn answer to interrogatory twenty-one, and his numerous statements in the depositions under oath, with respect to the statement, were all untrue.

We find, as did both the DEC and DRB, that respondent's conduct in asserting that the statement was written and signed by Sylvia Lunn was deceitful, in violation of *DR* 1–102(A)(4), and prejudicial to the administration of justice, in violation of *DR* 1–102(A)(5). Moreover, we find that respondent violated *DR* 7–102(A)(5) by knowingly making false statements of fact, and *DR* 7–102(A)(6) by preserving evidence that he knew to be false.

The question now becomes what is the appropriate sanction. It is well-established that the primary reason for discipline is not to punish the attorney but to protect the public against members of the bar who are unworthy of their trust. In determining appropriate discipline we consider the interests of the public, the bar, and the respondent. *In re Kushner*, 101 *N.J.* 397, 400, 502 *A.*2d 32 (1986).·

Each disciplinary case is fact-sensitive. Nonetheless, prior cases are helpful in suggesting the scope of appropriate discipline. Respondent's conduct is most analogous to the conduct of respondent in *In re Kushner, supra.* There an attorney with an unblemished professional record made a false statement to a court by denying that he had signed promissory notes that were the subject of civil litigation. He had signed a promissory note with his business partner. When the note went into default, respondent's partner filed a petition for bankruptcy, and respondent falsely claimed that he had not signed or authorized anyone to sign the note on his behalf,

asserting that his signatures were forged. 101 *N.J.* at 399, 502 *A.*2d 32. When the bank instituted legal action to collect the money due on the note, Mr. Kushner persisted in his answer that the signatures were not his.

Unlike respondent in this matter, Kushner pleaded guilty to false swearing pursuant to *N.J.S.A.* 2C:28–2a. Both respondent and Kushner made false certifications in civil actions for their own benefit, and their misconduct antedated our decision in *In re Verdiramo,* 96 *N.J.* 183, 475 *A.*2d 45 (1984). We suspended Kushner for three years.

Respondent's conduct also is similar to the conduct of the attorney in *In re Schleimer,* 78 *N.J.* 317, 319, 394 *A.*2d 359 (1978), who falsely testified at a deposition in a civil case in which he was a party. In imposing a one-year suspension in *Schleimer,* we considered as mitigating factors respondent's forty years of unblemished legal service and declining practice due to age. Respondent also has been practicing for several years and has not previously been a subject of discipline.

Respondent's conduct was not as egregious as the conduct of respondent in *In re Edson,* 108 *N.J.* 464, 530 *A.*2d 1246 (1987) (attorney advised his client and an expert witness to lie about evidence in two different matters before municipal courts), nor respondent in *In re Bricker,* 90 *N.J.* 6, 446 *A.*2d 1195 (1982) (attorney obtained title to a number of valuable properties through repeated acts of misrepresentations, some while under oath). Both attorneys were disbarred.

Respondent did not engage in a continuous course of deceitful and fraudulent conduct as did Edson and Bricker. Instead, like Kushner and Schleimer, respondent's false swearing was limited to one incident.

Nonetheless, respondent's conduct was more serious than respondent's conduct in *In re Johnson,* 102 *N.J.* 504, 509 *A.*2d 171 (1986) (attorney who lied to a judge that his associate was ill to secure an adjournment in an ongoing trial was suspended for three months). Respondent's conduct is more reprehensible

than that of the attorney in *In re McNally*, 81 *N.J.* 304, 406 *A.*2d 1315 (1979), who forged a sheriff's name to a deed of foreclosure and fraudulently witnessed the instrument. In *McNally* we suspended the attorney for two years but recognized as mitigating factors respondent's inexperience, his remorse, and his cooperation with the ethics authorities.

In imposing the appropriate sanction we consider all the relevant circumstances. We recognize that respondent has been a member of the bar for many years, has never been the subject of prior discipline, and that his misconduct arose out of one incident. Nonetheless, his misconduct, deliberately lying under oath in a civil action pursued for his own benefit, directly undermines the administration of justice. Moreover, respondent shows little remorse for his misconduct and appears to fail to understand the gravity of the offense.

The DRB recommends that respondent be suspended from the practice of law for one year. Our dissenting colleague recommends disbarment. We disagree with both. In *Kushner*, we suspended respondent from the practice of law for three years. We think such discipline is appropriate in this case.

We therefore conclude that respondent should be suspended from the practice of law for three years.

Respondent shall reimburse the Ethics Financial Committee for any administrative costs.

So ordered.

## ORDER

It is ORDERED that THOMAS A. LUNN of CAMDEN, who was admitted to the bar of this State in 1960, be suspended from the practice of law for a period of three years, effective March 31, 1990, and until the further order of this Court; and it is further

ORDERED that THOMAS A. LUNN reimburse the Ethics Financial Committee for appropriate administrative costs; and it is further

ORDERED that THOMAS A. LUNN be restrained and enjoined from practicing law during the period of his suspension; and it is further

ORDERED that THOMAS A. LUNN comply with Administrative Guideline Number 23 of the Office of Attorney Ethics dealing with suspended attorneys.

CLIFFORD, J., dissenting.

Distasteful as I find the exercise to be, I record my disagreement with the Court's assessment of the appropriate discipline.

Respondent submitted what purported to be a witness's statement in support of his own personal-injury claim, then repeatedly lied under oath about the authorship of that statement and the circumstances of its preparation, knowingly and intentionally perpetuated his lie for about four years, and to this day cannot bring himself to acknowledge that his blatant falsehoods amount to any more than "an immaterial misrepresentation that took place once in the course of a two hundred page deposition * * *." For me the question is whether this Court can tolerate as a member of our honorable profession one who has been shown by clear and convincing evidence to be a calculating, self-serving liar. The answer is "no." I would disbar.

I

Respondent claimed personal injuries as the result of an escalator accident in April 1980, witnessed by his late wife (Mrs. Lunn died in August 1980) and his seventeen-year-old son. He sued both the manufacturer of the escalator and the casino resort in which it was located. As part of the discovery process defendants called respondent to testify under oath on oral depositions. In the course of those proceedings he was shown

a statement purportedly signed by his wife, which respondent had previously furnished to the insurance carrier for one of the defendants. After testifying that in the statement his wife had "just put down, you know, her recollection" of how the escalator had malfunctioned, respondent described the circumstances under which the statement had been prepared:

Q. Mr. Lunn, what's been marked W–1, that is your wife's statement—
A. Yeah.
Q. —she wrote out that out [sic]; is that correct?
A. Yeah.
Q. And you didn't suggest any facts to her; is that correct?
A. I don't really remember. All I know, it was her recollection of what occurred.
Q. What did you tell her was important to include in the statement?
A. As to what happened and, you know, where—where we were and why we were there and where we were coming from and basically that was it, I guess, what happened.
Q. Has your—had your wife written any other statement to anyone concerning this incident?
A. Not to the best of my knowledge.
Q. Does she have any written notes to herself or written form of any kind setting forth her recollection of what occurred, aside from what's been marked as W–1?
A. I don't know. I don't think so.

        \*      \*      \*      \*      \*      \*      \*      \*

Q. At the time of this incident was your wife in any manner ill that you were aware of?
A. No, she died suddenly.

        \*      \*      \*      \*      \*      \*      \*      \*

Q. So she was not suffering from anything that everybody knew about at the time of this incident?
A. No, she was not under any disability.

In a more pointed line of inquiry defense counsel asked, with unmistakable clarity, whether respondent's wife had "physically" written the statement herself:

Q. Okay. Let me ask you first about W–1, which is a two-page statement. Did Sylvia herself write that out, sir, physically write it out? Not did she dictate that to somebody or did she tell somebody else and they wrote it down. Did she physically write that?
A. Well, to the best of my recollection, you know, as I've indicated to you, this was written, signed by my wife in our dining room after we discussed, you

know, preparing some sort of a memo or statement or whatever concerning this incident.

Q. Okay. Whose idea was it to prepare such memos?

A. Mine.

Q. Let me ask you this: you, of course, were married to your wife for a great number of years. Are you familiar with her handwriting?

A. Yes.

Q. Is that her handwriting on W-1?

A. As I've testified, yes.

It is apparent that as the litigation progressed, respondent could not help but realize that defendants suspected some problem with Sylvia Lunn's statement. In June 1983 defendants secured a court order compelling respondent to furnish "cancelled personal checks from March, April and May of 1980 signed by Mrs. Lunn—Sylvia Lunn." When respondent failed to comply with that order, after six weeks, defendant obtained another order, which expressly provided that if respondent failed to hand over the checks bearing his wife's signature, his Complaint would be dismissed. Two months after the date of that order respondent took a voluntary dismissal of his lawsuit, with prejudice—a lawsuit in which he claimed painful and disabling permanent injuries that as of October 1982, the date of answers to interrogatories, had caused about $2900 in medical expenses, a lawsuit for which an offer of settlement remained and was rejected at the time of the dismissal ("I dismissed my case even though I was offered some money at that time. I didn't want it.").

Had not one of the defense counsel brought the foregoing circumstances to the attention of the Camden County Prosecutor's office, the matter might have ended there. But fortunately for the integrity of the system, it did not. The efforts of the law-enforcement authorities produced respondent's written stipulation that when he gave deposition testimony in his lawsuit, he "knew that [he] had written the body of, and signed the name of Sylvia P. Lunn" to, the statement that he had sixteen months previously sworn was written and signed by his wife.

The prosecutor's office submitted the stipulation to the ethics authorities, who initiated these proceedings.

When confronted with the statement at the District Ethics Committee (DEC) hearing, respondent admitted that he had written it and signed his wife's name to it. He thereupon volunteered the explanation that "I did it when she asked me to and she was having problems writing a statement herself." The "problems," he explained, were connected with his wife's "hypoglycemia and her tendency to shake and get shook up and nervous," even though at his earlier deposition testimony he had averred that at the time of the escalator accident (three days preceding the preparation of the statement) Mrs. Lunn "was not under any disability." Respondent told the DEC that he had intended to have what he had written typed in his office, after which he would have his wife sign it, but he did not have the opportunity to do so.

## II

Based on the foregoing, the Disciplinary Review Board (DRB) agreed with the DEC's conclusions finding respondent guilty of unethical conduct, citing specifically *DR* s 1–102(A)(4), (5), and (6). The DRB's reason for recommending a suspension of one year is, however, unconvincing: that respondent's conduct was "not as egregious" as that of the respondent in *In re McNally*, 81 *N.J.* 304, 406 *A.*2d 1315 (1979), in which this Court suspended McNally for two years for forging a sheriff's name to a deed of foreclosure and fraudulently witnessing the instrument. After first observing that "[o]rdinarily [McNally's] conduct would call for the severest kind of discipline," *id.* at 305, 406 *A.*2d 1315, we imposed the suspension because of mitigating circumstances: McNally panicked when confronted with a situation beyond his capabilities, he sought no personal profit or gain from his actions other than retention of his employment, he cooperated with the ethics authorities, and his remorse was clear. *Id.* at 306, 406 *A.*2d 1315.

In sharp contrast to McNally, this respondent concocted a lie for personal gain, persisted in perpetuating that lie in sworn testimony designed to advance his own interests, and has consistently failed to acknowledge the magnitude of his professional dereliction, choosing instead to dissemble, to find excuses where there are none. The circumstances are much closer to those in *In re Edson*, 108 *N.J.* 464, 530 *A.*2d 1246 (1987), in which we disbarred an attorney who had counselled his client to fabricate a defense to a driving-while-intoxicated charge on the basis of material facts that the respondent knew to be false, permitted the client to perjure himself in court, and himself lied to the prosecuting attorney.

Perhaps most distressing is respondent's lawyer's assertion at oral argument before us that respondent's "lie or group of lies * * * really in the long run hurt no one"; and that lying to a court is "not that severe a violation of any of our rules of conduct or anything else"; and, perhaps most astonishing, "[i]t goes on every day in every court and we would be naive and hiding our heads in the sand if we didn't say that." All three assertions are absurd. The first is outrageous, the second exasperating, the third insulting, and none is accurate.

As we observed in *Edson, supra,* the members of this Court, all practicing lawyers before we became judges, have encountered in our professional experience "all kinds of lawyers— most very good, some perhaps indifferent, and a mere handful bad." 108 *N.J.* at 472, 530 *A.*2d 1246. Although it is probably unseemly as well as unwise to recite in a judicial opinion one's own personal experiences, I take the liberty of observing that during two decades spent trying cases in every county courthouse save two in this state, I could count on my fingers the lawyers capable of the kind of mendacity practiced by this respondent. Everybody knew them, everybody took special precautions in dealing with them, and eventually the ethics system, primitive then by comparison with today's, caught up with most of them. The suggestion that respondent's conduct hurt no one overlooks the fact that the vast majority of lawyers

in this state are decent, trustworthy professionals. When one of their own misbehaves, that misconduct touches them all. When one of their own poisons the wellspring of justice, as this respondent has done, the taint reaches even the best, just as a judge's failure to act within the necessary restrictions on his or her public conduct casts a shadow on the entire judiciary.

Having taken an oath to tell the truth, respondent lied, for no reason other than to serve his own interest. In concluding that a period of suspension constitutes an adequate response to that transgression, the Court not only misappraises the gravity of respondent's misconduct but also trivializes the significance of the oath itself. The extent to which the integrity of our system of justice, particularly the adversary system, depends on the sanctity of the oath cannot be underestimated. We rely on people to tell the truth. Some lie. When discovered, they are subject to punishment. This Court's indulgent treatment of lying under oath by an officer of the court for his own selfish purposes is entirely out of step with our dedication to basic principles of justice and with our oft-proclaimed goal of assuring that members of the bar adhere to the highest professional standards.

The Court would do well to recall, as it did in *In re Edson, supra,* the admonition that lawyers

> must possess a certain set of traits—honesty and truthfulness, trustworthiness and responsibility, and a professional commitment to the judicial process and the administration of justice. Those personal characteristics are required to ensure that lawyers will serve both their clients and the administration of justice honorably and responsibly.
>
> [108 *N.J.* at 473, 530 *A.*2d 1246 (quoting *Application of Matthews,* 94 *N.J.* 59, 77, 462 *A.*2d 165 (1983)).]

Some stains fade and disappear over time. Others, too deep, too penetrating, too lasting to be eradicated by any but the most drastic means, must be cut from the cloth. Because I conclude that respondent failed so abysmally to meet the demands of the profession and appears even now not to understand those demands, I vote to disbar.

176

*For suspension*—Chief Justice WILENTZ and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—6.

*For disbarment*—Justice CLIFFORD—1.