585 A.2d 326

IN THE MATTER OF DAVID R. LAROSEE, AN ATTORNEY AT LAW.

Argued September 10, 1990—Decided February 15, 1991.

Paula T. Granuzzo, Deputy Ethics Counsel, argued the cause on behalf of Office of Attorney Ethics.

Edward Hunter and David R. LaRosee, pro se argued the cause for respondent.

PER CURIAM.

In this matter, we consider ten complaints filed against respondent, David LaRosee, in two separate proceedings. In the first proceeding, concerning one complaint (the Sultan matter), the District Ethics Committee found that respondent had engaged in misconduct in the course of representing a client before the United States Immigration and Naturalization Service. The Disciplinary Review Board (DRB) concluded that the District Ethics Committee's findings of unethical conduct were "fully supported by clear and convincing evidence," and recommended a three-year suspension from the practice of law for those ethical violations.

In the second proceeding concerning the nine other complaints, a Special Ethics Master recommended that five be dismissed. In the four remaining matters—Petitt, DuFour, Bertles, and Sebasto—the Special Ethics Master found ethical violations. In the Petitt matter, the Master determined that respondent had failed to advise his clients that he had turned over their file to another attorney when he moved to Massachusetts and ceased to practice law in New Jersey. In the DuFour matter, the Master found that respondent had violated record-keeping requirements by failing to maintain client ledger cards, and when audited had failed to comply with the auditor's

numerous requests for information. In the Bertles matter, the Master determined that respondent had attempted to suborn perjury. In the Sebasto matter, the Special Ethics Master found the second count, alleging misappropriation of clients' trust funds, to have been established, but dismissed the first count, which alleged a conflict of interest.[1]

The DRB concurred with the Special Ethics Master that the allegations of unethical conduct in the Petitt, DuFour, Bertles, and Sebasto matters were "fully supported by clear and convincing evidence." The DRB also agreed that the five other complaints and the first count in the Sebasto matter should be dismissed. The DRB recommended that respondent's unethical conduct in the Bertles and Sebasto matters warranted disbarment.

On June 7, 1988, this Court temporarily suspended respondent based on the DRB report and recommendation in the Sultan matter.

## I.

### The Sultan Matter

The DRB found the following facts:

In or about June 1980, respondent was retained by Asif Sultan (Sultan) to incorporate the Sultan family business, Salatin, Inc. Some months later, in or about October 1980, respondent was asked by Sultan to file applications with the United States Immigration and Naturalization Service (I.N.S.) for a change in immigration status for his son, Iqbal Sultan (Iqbal), himself and their respective families.

On or about October 14, 1980, respondent met with Asif Sultan at Salatin's offices in the World Trade Center. At that time, he provided Sultan with two blank forms and asked him to sign one, have Iqbal sign the other, and return both to him. No written retainer agreement was executed. However, respondent submitted a bill, dated October 14, 1980, charging Sultan $2,500 for his professional services. According to Sultan, respondent's fee was to be $1,000

---

[1]Respondent's actions occurred both before and after September 1, 1984, the date on which the Rules of Professional Conduct replaced the Disciplinary Rules. Hence, we refer to either the Disciplinary Rules or the Rules of Professional Conduct, depending on when the misconduct occurred.

per application for a total of $2,000, payable upon completion. Sultan was also to pay all out-of-pocket expenses and did in fact provide respondent with an initial check for $200. Respondent, however, avers that his fee was $1,000 per adult person for a total of $4,000, plus all fees and expenses. According to respondent, one-half of his fee was payable in advance, with the balance due upon completion. Hence the bill for $2,500 included $500 for expenses. No other bills or invoice letters were ever prepared or submitted to Sultan. Sultan made no further payment.

After returning the signed forms to respondent, Sultan inquired numerous times regarding the status of the applications without receiving a reply. Approximately seven months later, Sultan received a letter dated May 20, 1981, from respondent. In this letter, respondent indicated that he had been informally advised that Iqbal's application had been forwarded to the District Director's Office for favorable determination but that he had been unable to trace Asif Sultan's application.

Upon receiving this letter, Sultan contacted the I.N.S. office in New York City and learned that said office had no record of his application having been filed. Subsequent requests to respondent for either a copy of the application that had supposedly been filed or a satisfactory explanation went unheeded. Consequently, on or about June 26, 1981, Sultan testified that he "literally, physically pulled [respondent] by the arm and took him to the immigration office in New York and had [his] application filed."

Given his experiences with respondent up to this point, Sultan sent respondent a series of letters via certified mail requesting copies of and information concerning the application supposedly filed on Iqbal's behalf. These letters, dated July 8, July 22, August 8, August 10 and November 3, 1981, did not secure a single written response. In fact, respondent "sometimes didn't even open the letters...." Follow-up telephone calls to respondent also failed to elicit a satisfactory response. Respondent acknowledged that he "wasn't anxious at all to do anything for Mr. Sultan in any way, shape or form."

Ultimately, around November 24, 1981, respondent provided Sultan with a document from the I.N.S. purportedly granting the Iqbal Sultan family's application for an adjustment of status to that of permanent resident. Iqbal had requested nonimmigrant Inter–Company Transferee status.

The document sent to Sultan was not genuine. Respondent originally received it in connection with an application filed on behalf of another client, Robert Newsham. According to the testimony of the I.N.S. officer who had prepared the papers, the document granting permanent resident status to the Newsham family was altered by deleting the name Newsham and inserting the name Sultan in its place. The remainder, including the five docket or file numbers representing the five members of the Newsham family, was not altered. [At all times relevant hereto, the Iqbal Sultan family unit consisted of but three individuals, to wit: Iqbal, his wife Rukshana and daughter Mariam.]

Sultan questioned the genuineness of this document upon receipt but was assured by respondent that it was indeed authentic. Subsequent requests that respondent verify the authenticity and correctness of the document went unheeded. Sultan did not receive any further communication from respondent

until July 6, 1983, after the initial complaint giving rise to these proceedings had been filed by Sultan. In this letter, respondent indicated that he had consulted an I.N.S. representative and determined it would be necessary to appear at the district office in person and refile Iqbal's application.

The DRB found that respondent had been grossly negligent and deceitful in his communications with his client, having materially altered a document from the United States Immigration and Naturalization Service. The DRB concluded that respondent had violated DR 2–110(A)(2), 6–101(A)(1), 1–102(A)(4), and 1–102(A)(5), and recommended public discipline for those violations.

## The Petitt Matter

As found by the DRB, the facts are as follows:

In December 1985, Richard and Barbara Petitt retained respondent to represent them in an action for negligence and fraud against the builder of their house and other co-defendants. After respondent instituted suit, he ceased practicing law in New Jersey and moved to Massachusetts in April 1986, without giving notice to his clients.

After the receipt of a trial notice, one of the co-defendants offered $1,500 in settlement of the Petitts' claim. Respondent testified that he communicated the settlement offer to Mrs. Petitt by telephone on that same day, October 2, 1986, and that she accepted the offer for herself and her husband. Respondent did not inform Mrs. Petitt of the upcoming trial date. Mrs. Petitt, in turn, testified that she did not accept the offer; rather, she told respondent that she would discuss the offer with her husband and then advise respondent of their decision.

After the October 2, 1986 conversation with Mrs. Petitt, respondent accepted the settlement offer in the Petitts' behalf. No settlement documents were ever prepared, however. It was respondent's belief that the documents would be drafted by another attorney to whom respondent had entrusted the file before he left for Massachusetts. A substitution of attorney was never signed, however, and respondent did not consult with his clients before turning the file over to the attorney.

Approximately one week after respondent's conversation with Mrs. Petitt, Mr. Petitt unsuccessfully attempted to contact respondent by telephone. He was informed that the telephone had been disconnected and that no further information was available. Thereafter, Mr. Petitt drove by respondent's house, which displayed a "For Sale" sign. He rang the bell, but there was no answer. The house appeared to be vacant.

One month later, after he talked to a painter who was working on respondent's house, Mr. Petitt discovered that respondent had moved to Massachusetts. Mr. Petitt then contacted respondent in Massachusetts and advised him

that the $1,500 sum was not acceptable to him. Thereafter, respondent made no efforts to vacate the settlement and have the matter relisted for trial.

Based on those findings, the DRB concluded that respondent failed to advise his clients that he had turned over the file to another attorney. He never discussed the transfer of the file with the Petitts or obtained their consent thereto. Respondent simply abdicated his responsibility to handle the matter, which had been entrusted to him, not to the other attorney.

Furthermore, respondent ceased to practice law in New Jersey and never advised his clients of his move to Massachusetts. Thereafter, he failed to keep the Petitts apprised of the status of their matter, except for the October 2, 1986 telephone call communicating the settlement offer to Mrs. Petitt. Even then, he did not disclose to her the upcoming trial date. The Board finds that respondent's conduct was inexcusable and in violation of R.P.C. 1.3, 1.1(a) and 1.4(a).

## The DuFour Matter

## The DRB made the following findings:

As a result of an ethics complaint filed by respondent's former law partner, Richard Hale, the Office of Attorney Ethics ("OAE") retained Jeffrey D. DuFour, a Certified Public Accountant, to conduct an audit of respondent's trust account records. After an initial meeting with Respondent on November 3, 1982, Mr. DuFour requested that respondent produce certain records for his review as soon as possible. When respondent failed to submit the records requested, by letter dated November 24, 1982, the OAE demanded that respondent do so by December 3, 1982. Respondent complied with the above demand on December 2, 1982. On January 18, 1983, Mr. DuFour asked respondent to furnish him with additional information concerning his trust account activity by no later than the end of January. When respondent failed to comply with his request, by letter dated February 14, 1983, Mr. DuFour reminded respondent of his promise to deliver the documents to Mr. DuFour's office on February 10, 1983. Mr. DuFour urged respondent to contact him as soon as possible to resolve the matter. It was not until March 2, 1983, that respondent submitted the requested information. After reviewing it, on July 26, 1983, Mr. DuFour asked respondent to clarify certain discrepancies and explain an apparent trust account shortage. Although respondent replied shortly thereafter, Mr. DuFour noted that several questions contained in his July 26, 1983 letter remained unanswered. He so notified respondent by letter dated February 10, 1984. Respondent wrote to Mr. DuFour on February 28 and March 8, 1984, but, as pointed out in Mr. DuFour's subsequent letter of March 12, 1984, some items still remained unexplained.

The audit conducted by Mr. DuFour encompassed the period from October 1981 through October 1982. On June 6, 1984, Mr. DuFour submitted an affidavit detailing certain recordkeeping violations—including the failure to

maintain client ledger cards and to reconcile the trust account balances with the individual ledger cards—and an apparent trust account shortage of $8,841.15.

Based on those findings, the DRB concluded that

respondent violated the recordkeeping provisions of *R.* 1:21–6, by failing to maintain client ledger cards and to reconcile the trust account records with the individual ledger cards. His conduct was unethical and violative of *DR* 9–102(C). In addition, respondent failed to comply with the auditor's numerous requests for information, as set forth in detail in the factual recitation above, in violation of *R.* 1:21–6(g) and (h) and *DR* 9–102.

## *The Bertles Matter*

In late 1981 or early 1982, respondent had represented Timothy Bertles in a criminal matter involving the alleged possession of drugs and another charge. Subsequently, in January 1982, either Bertles or his parents retained a different attorney to represent him in that matter. Respondent has admitted to writing the following letter to Bertles on February 2, 1982:

Dear Timmy:

I received a *very* interesting call from [co-defendant] Mike the other day. He suggests that if $500.00 were deposited to his account at Yardville he will "take the fall" for all Middlesex County charges.

I don't know what you want to do, it's up to you and Mr. Schragger [Bertles' new attorney]. However, if you tell [Mr. Schragger] about it he'll probably say that you shouldn't do it, it's unethical, etc.

Mike now contends that he said "the jacket is mine" rather than that the "ludes" were his. He also said that Conetto asked him to write the letter where he said they were his.

Please call collect to discuss this and other matters.

The Special Ethics Master observed that

the letter in question * * * presents a fairly serious violation of the ethics of the profession. Without mentioning any specific Rule of Professional Conduct, it is apparent from the face of the letter that there is at least an attempt to suborn perjury. On the other hand, it seems almost unbelievable that an attorney-at-law would write a letter suggesting perjury such as this letter before us. Viewed from this approach, the letter presents nothing more than a report of something that has transpired and which respondent wanted to communicate to his *former* client.

The Special Ethics Master concluded that the letter "indicates a suggestion by respondent that the proper administration of justice be interfered with." He further concluded that disciplinary action is warranted, but deferred to the DRB to recom-

mend the extent of such discipline. The DRB found respondent's conduct "nothing short of atrocious," observing that respondent's letter suggests that his former client pay his co-defendant to lie, the letter acknowledging that such a course of action is probably unethical. The DRB found that "[a] more abominable course of conduct is difficult to fathom," and concluded that respondent "aided and abetted the commission of subornation of perjury," citing *N.J.S.A.* 2C:2–6 and *N.J.S.A.* 2C:28–5.

### The Sebasto Matter

In this matter, respondent represented two families, the Fagans and the Brienings. Each of the families owned an interest in a restaurant known as Heavens II and in the underlying property. The restaurant was operated by Mican, Inc., and the land on which it was located was owned by Red Land Realty, a general partnership. The other beneficial owners of the business were Sandra Irish and Joseph Sebasto.

In the latter part of 1984, when it became apparent that the business was foundering, a corporate meeting was called to address that problem. The agenda for the meeting included consideration of two options, either selling the business or filing for protection under the Bankruptcy Code. Mrs. Fagans had given respondent a power of attorney, and he attended the meeting as her representative. Heavens II was represented by Edward Bernstein, its corporate counsel. At the meeting, the bankruptcy option was discarded, and the parties agreed to sell the business. The owners retained respondent to sell the business and agreed to pay him a commission when the sale had occurred. *Cf. In re Roth,* 120 *N.J.* 665, 675, 577 *A.*2d 490 (1990) (holding that attorney unlicensed as broker must confine brokerage services to those incidental to practice of law and not receive separate compensation for brokerage services).

Some time after the meeting, respondent informed the owners of the business that he had located a buyer. Respondent

and Bernstein jointly drafted a Stock Purchase Agreement for Mican and a Purchase and Sale Agreement for Red Land Realty (the contracts), in which the stated purchaser was David R. LaRosee "and/or his assigns." In connection with the contracts, respondent advised the sellers by letter of their right to obtain separate counsel, and the sellers acknowledged that they had expressly waived that right.

Respondent testified that he was acting as an agent for undisclosed principals. Bernstein, Sebasto, and Irish, however, testified that they believed respondent was acting in his own behalf. No buyer other than respondent was ever identified to the sellers. Further, respondent admitted that he was to have an "equity position" in the business.

The draft contracts provided for a $15,000 down payment. On September 28, 1984, respondent issued a check from his trust account in the amount of $15,000 to Bernstein. Accompanying the check was the following handwritten letter:

> Enclosed please find a check in the amount of $15,000 for deposit on the Mican–Redland matter. Please do not *disburse* without authority from all parties.
>
> (Emphasis added.)

Respondent testified that he gave Bernstein the check merely to hold, not to deposit. He stated that although he was well aware of the different meanings of "disburse" and "deposit," he and Bernstein had orally agreed that Bernstein was not to deposit the check until "[respondent] gave him the go-ahead." Respondent testified that he told Bernstein not to deposit the check until respondent was satisfied with the agreement and had been authorized by his principal to release the funds. Bernstein, however, testified that he was unsure what respondent had meant by the note accompanying the check. Bernstein testified that in a discussion subsequent to the issuance of the check, he and respondent had agreed that Bernstein would deposit the check after respondent had approved the terms of the contract.

Respondent further testified that the undisclosed principals had given him $18,000 in cash, but had never authorized the disbursement of those funds. Respondent claimed to have held the money either at home or in his safe deposit box. Respondent acknowledged that he never had deposited the $18,000 in his trust account or any other account. Thus, the $15,000 check was drawn against trust-account funds belonging to other clients.

Bernstein did not deposit the check for a period of time after receiving it. Sometime prior to November 8, 1984, respondent agreed to the terms of the contracts, and Bernstein deposited the $15,000 check. Respondent stated that although he had approved the terms of the contracts, he had never authorized Bernstein to deposit the check. On November 8, 1984, the contracts were executed, and respondent signed the contract as "Purchaser." The contracts provided that

the Purchaser has *paid* on the date of this Agreement [$15,000] held in *trust* by Edelstein & Bernstein. The sum held in *trust* may be released by Edelstein & Bernstein to [the Sellers] or their counsel upon satisfaction of the contingencies set forth in * * * this Agreement.

(Emphasis added.)

Respondent testified that soon after the contracts were executed, he ascertained from his bank statement that Bernstein had deposited the $15,000 check. Respondent claims that immediately thereafter, he called Bernstein and demanded that Bernstein reimburse respondent's trust account. Bernstein communicated with all the sellers and informed them of respondent's demands. Irish testified that respondent also had phoned him at home between 10:30 and 11:00 p.m. According to Irish, respondent was extremely agitated and needed the money back to cover a check. After some negotiation through the night and into the early morning, an agreement was reached whereby the sellers had Bernstein issue a check dated November 10, 1984, for $15,000 to "David LaRosee, Esq., 'Trust Account.'" In exchange, respondent agreed to issue a $15,000 check from his business account. The following agreement

was executed by the parties at approximately 3:00 a.m. on November 10, 1984:

> We hereby authorize the release of the deposits of $15,000.00 under the stock purchase agreement and purchase and sale agreement dated Nov. 8, 1984 to the trust Account of David LaRosee Esquire, for our benefit. Thereafter David LaRosee shall issue either personally as purchaser under the agreement, or from his trust Account (for David LaRosee benefit) the aforesaid sum to the trust account of E.M. Bernstein on or before Nov. 15, 1984 to be held by him as deposits in trust until closing.

In accordance with the November 10th agreement, respondent issued a $15,000 check to Bernstein dated November 17, 1984, from his business account. On November 20, 1984, respondent sent Bernstein a letter rescinding the contracts and proceeded to stop payment on the November 17th check. Thereafter, the owners of the business brought suit against respondent to enforce the contracts.

The Special Ethics Master found that respondent had knowingly misappropriated clients' trust funds. He concluded that even if an undisclosed principal had been originally involved, the undisclosed principal had withdrawn from the transaction by November 8, 1984, leaving respondent as the sole purchaser. The DRB concurred with the finding that respondent had knowingly misappropriated clients' funds. The DRB determined that although respondent's issuance of the check from his trust account without funds to back it up "smacked of dishonesty," that action itself did not constitute a knowing misappropriation. The DRB observed that a knowing misappropriation requires both an intention to use clients' trust funds and an actual invasion of such funds. The DRB determined that respondent should have known that clients' funds would be improperly used if Bernstein deposited the check. The DRB found that the fact that respondent had never deposited funds in his trust account to cover the check, combined with Bernstein's subsequent deposit of the check, constituted a knowing misappropriation in violation of *RPC* 1.15.

## II.

█ Based on our independent review of the record, we concur with the DRB's findings in the Petitt and DuFour matters. We address separately respondent's conduct in the Sultan, Sebasto and Bertles matters.

In the Sultan matter, the record provides clear and convincing evidence to support the DRB's finding that respondent provided his client with a fraudulent document purporting to grant the Iqbal Sultan family permanent-resident status. We consider "forgery of public documents [to be] among the more serious offenses an attorney can commit." *In re Hughes*, 90 *N.J.* 32, 36, 446 *A.*2d 1208 (1982). That form of misconduct "demonstrates unfitness to practice law," *ibid.*, because it "severely damage[s] public confidence in the legal system." *Id.* at 39, 446 *A.*2d 1208. The DRB correctly observed that respondent's "conduct created a clear potential for harm to his clients." If Sultan had relied on the altered document and had taken no independent action, he and his family might have been threatened with deportation. We have consistently held that conduct similar to respondent's warrants severe discipline. *See, e.g., In re Chidiac*, 109 *N.J.* 84, 533 *A.*2d 704 (1987) (indefinite suspension imposed on attorney who altered inheritance-tax waiver); *In re Yacavino*, 100 *N.J.* 50, 494 *A.*2d 801 (1985) (attorney suspended three years for preparing two fictitious adoption orders); *In re Hughes, supra*, 90 *N.J.* 32, 446 *A.*2d 1208 (attorney disbarred for bribing public official and falsifying federal tax records); *In re McNally*, 81 *N.J.* 304, 406 *A.*2d 1315 (1979) (attorney suspended two years for preparing and recording forged Sheriff's deed).

█ The DRB concluded that in the Sebasto matter, "respondent was guilty of the most serious ethics violation that may be committed by an attorney-at-law," a knowing misappropriation of clients' trust funds. We have consistently held that when an attorney has knowingly misappropriated clients' trust funds, no matter for what purpose, the result will be disbarment. *In re*

*Wilson,* 81 *N.J.* 451, 453, 409 *A.*2d 1153 (1979). Because the sanction for knowing misappropriation is severe and permanent, we must be satisfied by clear and convincing evidence that there was an intentional invasion of clients' funds. *In re Perez,* 104 *N.J.* 316, 324, 517 *A.*2d 123 (1986).

The DRB concluded that the $15,000 check issued from respondent's trust account, when deposited, amounted to a knowing misappropriation of clients' trust funds. Respondent contends that he did not intend to misappropriate funds from his trust account. He states that he never authorized Bernstein to deposit the check. It is undisputed, however, that respondent never deposited funds in his trust account to cover the September 28th $15,000 check. His stated reason for not doing so was that he never received authorization from the undisclosed buyers. When respondent delivered the check to Bernstein without explicit written directions not to *deposit* the check, it is indisputable that he should have known that invasion of trust funds was a possible result.

The critical issue, however, is whether respondent intended that the trust-account check be deposited, which would necessarily result in the invasion of clients' trust funds. Some evidence in the record suggests that respondent should have known that Bernstein's deposit of the check was inevitable. Thus, the contracts provided that the $15,000 down payment was to be "held in trust" by the sellers' attorney, language that plainly contemplates that sellers' counsel was required to deposit the down-payment check into their trust account.

On the other hand, respondent's conduct when he learned that the check had in fact been deposited did not reflect the state of mind associated with a knowing misappropriation. The undisputed testimony is that respondent was surprised and extremely agitated on learning that the check had been deposited. He immediately commenced negotiations with the sellers and their counsel, the negotiations continuing through the evening and into the early hours of the following morning. The

agreement that resulted required sellers' counsel to return the $15,000 to respondent, subject to respondent's promise to replace the funds within a few days. In addition, the sellers' attorney testified that he was not authorized to deposit the check until the contracts had been approved by respondent. According to Bernstein's testimony, although respondent had never specifically authorized the deposit of the check, Bernstein assumed that the approval of the terms of the contract constituted such an authorization.

On this record, we are unable to conclude that there is clear and convincing evidence that respondent knowingly misappropriated clients' funds. Nevertheless, respondent's conduct in issuing a check from his trust account to serve as a good-faith deposit for the purchase of a business was both improper and inexcusable. We are satisfied from the evidence in the record that respondent was the actual purchaser in the aborted transaction. *RPC* 1.15 mandates that clients' funds be maintained separately. By issuing a check from his trust account without corresponding funds on deposit, respondent exposed his clients' funds to an unauthorized risk of withdrawal, in violation of the mandate of *RPC* 1.15. Moreover, the mere issuance and delivery of the check drawn on his trust account was deceitful in that it constituted a representation by respondent that his trust account contained funds that were available to serve as a down payment, thereby violating *RPC* 8.4(c), which prohibits "conduct involving dishonesty, fraud, deceit, or misrepresentation." Accordingly, even though we do not find that respondent committed a knowing misappropriation of clients' funds, respondent's conduct in the Sebasto matter warrants severe discipline.

In the Bertles matter, the DRB concluded that "respondent aided and abetted the commission of subornation of perjury." In reaching that conclusion, the DRB noted that in respondent's letter to his former client, he relates the willingness of his client's co-defendant to "take the fall" for the charges against both of them, provided that $500 be deposited in the co-defendant's account. Astonishingly, respondent suggests to his former client, Bertles, that he call [respondent] collect to discuss this * * *

matter," because, if Bertles were to discuss it with his new attorney, that attorney would advise Bertles against accepting the co-defendant's proposal, on the basis that it was "unethical."

Respondent's letter to Bertles can fairly be read to suggest that Bertles consider paying his co-defendant to perpetrate a fraud on the court. *DR* 7–102(A)(7) provides that "a lawyer shall not counsel or assist his client in conduct that the lawyer knows to be illegal or fraudulent." We are clearly convinced that respondent's letter forwarding the co-defendant's offer encouraged Bertles to engage in conduct that is both fraudulent and illegal. The DRB, relying on *In re Edson*, 108 *N.J.* 464, 530 *A.*2d 1246 (1987), concluded that respondent's conduct in the Bertles matter warranted disbarment. In *Edson*, we found that the attorney's fabrication of an extrapolation defense in two drunk-driving prosecutions exhibited a "shocking disregard of professional standards," *id.* at 472, 530 *A.*2d 1246, requiring his disbarment.

In *In re Verdiramo*, 96 *N.J.* 183, 475 *A.*2d 45 (1984), we held that an attempt to influence a witness's testimony constituted serious misconduct in that it "directly poison[s] the well of justice." *Id.* at 186, 475 *A.*2d 45. Since *Verdiramo*, we have consistently held that conduct that threatens to obstruct the administration of justice warrants severe discipline. *See In re Lunn*, 118 *N.J.* 163, 570 *A.*2d 940 (1990) (three-year suspension for lying under oath); *In re Silverman*, 113 *N.J.* 193, 549 *A.*2d 1225 (1988) (six-year suspension for false swearing); *In re Baldino*, 105 *N.J.* 453, 522 *A.*2d 998 (1987) (disbarment for attempting to subvert member of grand jury); *In re Kushner*, 101 *N.J.* 397, 502 *A.*2d 32 (1986) (three-year suspension for making false certification in court).

Respondent violated a fundamental ethical principle when he encouraged his former client to present false testimony. As we observed in *In re Rosen*, 88 *N.J.* 1, 3, 438 *A.*2d 316 (1981), "[a]ttempted subornation of perjury is an inexcusable and reprehensible transgression." In comparing misconduct that af-

fects the administration of justice to a *Wilson* violation, we have stated:

> Professional misconduct that takes aim at the public-at-large is as grave as the misconduct that victimizes a lawyer's individual clients. Because such a transgression directly subverts and corrupts the administration of justice, it must be ranked among the most egregious of ethical violations.
>
> [*In re Verdiramo, supra,* 96 *N.J.* at 186, 475 *A.2d* 45.]

Respondent's misconduct in the Bertles matter was blatant and inexcusable. Dishonesty in the practice of law undermines the administration of justice. In unanimously recommending disbarment, the DRB stated:

> Respondent's conduct was an affront to all respectable members of the profession and intended to demean the judicial process, the integrity of which respondent swore to uphold.

Similarly, in the Sultan matter, respondent's misconduct in altering a public document and inducing his client to rely on it was egregious and inexcusable.

We concur in the discipline recommended by the DRB. We find that respondent's conduct in the Bertles matter, combined with his conduct in the Sebasto, Sultan, Petitt, and DuFour matters, warrants disbarment.

Respondent is disbarred. He shall reimburse the Ethics Financial Committee for appropriate administrative costs.

So ordered.

*For disbarment*—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*Opposed*—None.

### ORDER

It is ORDERED that DAVID R. LA ROSEE of TRENTON, who was admitted to the bar of this State in 1973, be disbarred and that his name be stricken from the roll of attorneys of this State, effective immediately; and it is further

ORDERED that DAVID R. LA ROSEE be and hereby is permanently restrained and enjoined from practicing law; and it is further

ORDERED that respondent comply with Administrative Guideline No. 23 of the Office of Attorney Ethics dealing with disbarred attorneys; and it is further

ORDERED that respondent reimburse the Ethics Financial Committee for appropriate administrative costs.