631 A.2d 937

IN THE MATTER OF DAVID C. ORT, AN ATTORNEY AT LAW.

Argued March 16, 1993—Decided October 8, 1993.

 

*Walton W. Kingsbery, III,* Deputy Ethics Counsel, argued the cause on behalf of Office of Attorney Ethics.

*Thomas J. Beetel* argued the cause for respondent.

PER CURIAM.

This attorney-disciplinary proceeding arose from respondent's representation of Mrs. Sophie Sawulak in the settlement of her late husband's estate. The grievance originated as a fee-arbitration matter. The Fee Arbitration Committee administratively dismissed the matter and referred it to the Office of Attorney Ethics.

The District X Ethics Committee (DEC) concluded that respondent had violated *RPC* 1.4(a) and (b) (failure to communicate); *RPC* 1.5(a) (unreasonable fee) and *RPC* 1.5(b) (failure to communicate basis or rate of fee); and *RPC* 8.4(c) (conduct involving dishonesty, fraud, deceit, or misrepresentation). Additionally, although the violation had not been charged in the complaint against respondent, the DEC found that respondent had violated *RPC* 1.2(a) by failing to abide by Mrs. Sawulak's decisions concerning matters within the scope of his representation. The DEC recommended "substantial public discipline."

The DRB concurred in the DEC's conclusions. The DRB also determined that respondent had engaged in conduct prejudicial to the administration of justice in violation of *RPC* 8.4(d). Four members of the DRB recommended a three-year suspension and two recommended disbarment. We conclude that the appropriate discipline for respondent's egregious misconduct is disbarment.

I

In late September 1989, Mrs. Sophie Sawulak communicated with respondent to discuss retaining his legal services in settling the estate of her deceased husband. Mrs. Sawulak had been separated from her husband for about three years and was living with her sister in Buffalo, New York. While they were married, Mrs. Sawulak and her husband had lived in Hackettstown, the municipality in which respondent's office was located.

After the initial telephone call, Mrs. Sawulak sent several letters to respondent describing details concerning the estate and indicat-

ing that she had evidence to prove that her husband had been involved in an extra-marital affair. She described the assets of the estate, which included the Hackettstown property, a small pension, two $500 life-insurance policies, a series of bi-monthly checks from an undisclosed source, an undisclosed amount of stock, several pieces of farm machinery, and household items. The aggregate value of the estate was estimated to be approximately $300,000.

Mrs. Sawulak returned to Hackettstown in early October 1989. On October 3, Mrs. Sawulak and her sister went to respondent's office, where Mrs. Sawulak signed a retainer agreement providing that the minimum fee would be six percent of the gross estate. The agreement's provisions relating to hourly rates and the preparation of itemized bills had been deleted. Mrs. Sawulak paid a $500 retainer fee.

Respondent testified that he had informed Mrs. Sawulak by letter that he would bill her at an hourly rate. According to respondent, he had sent the retainer agreement to Mrs. Sawulak with a cover letter that provided that "the hourly rate is between $115. and 135. depending on responsibility." Mrs. Sawulak testified that she had not received that letter nor the retainer agreement, but had seen the retainer agreement for the first time on October 3.

The cover letter was found in respondent's file. Another letter found in respondent's file, almost identical to the cover letter, made no reference to the hourly billing rate. The DRB inferred, based on a comparison of the two letters, that the sentence regarding hourly billing was added to the cover letter after it had been typed. Respondent admits having added that sentence. He explained before the DEC that he had neglected to include a description of the hourly rate, had added it, and then had mailed the corrected letter. When asked why all references to hourly rates had been deleted from the retainer agreement, respondent explained that the rate depended on the degree of difficulty and responsibility, and on October 3 he had not yet known "what * * *

the problems in this estate were going to be." He further testified that when he had acquired a better understanding of the degree of responsibility, he had sent to Mrs. Sawulak a third letter fixing the hourly rate at $125. Respondent could not produce a copy of that letter and Mrs. Sawulak testified that she had not received it.

Two days after signing the retainer agreement, Mrs. Sawulak returned to respondent's office and signed a power of attorney. The next day, October 6, respondent arranged for a deputy surrogate to come to his office and to appoint Mrs. Sawulak as administratrix of the estate.

Before Mrs. Sawulak returned to Buffalo, she arranged for a friend periodically to look in on the house. Respondent suggested that he, rather than a friend, inspect the property. Believing that inspecting the property was "part of [respondent's] services," Mrs. Sawulak agreed. She remained in Hackettstown about three weeks and then returned to Buffalo. Communication ·between Mrs. Sawulak and respondent thereafter was limited to telephone conversations and correspondence.

In late October, Mrs. Sawulak forwarded to respondent a Medicare check for $17,000, which respondent used to open an estate account on which he was the sole signatory. Additionally, respondent requested that Mrs. Sawulak authorize him to obtain a home-equity loan for the estate, secured by the Hackettstown house. Mrs. Sawulak denied that request three times. Nevertheless, in December 1989, respondent applied for and obtained a $25,000 home-equity loan on behalf of the estate. Respondent testified that he had sent Mrs. Sawulak a letter informing her of the loan. Mrs. Sawulak testified that she had not received such a letter. A subsequent letter from Mrs. Sawulak to respondent suggests that Mrs. Sawulak was unaware of the home-equity loan. In a letter dated February 28, 1990, she wrote, "Please send me the name of the bank and amount charged [and] receipt. What is the bank charging for?"

That letter was Mrs. Sawulak's third request for a breakdown of expenses charged to the estate account, respondent having failed to reply to two prior requests. In response to correspondence from respondent, Mrs. Sawulak wrote, "I would appreciate it if you would break it down where you have 'Appraisal, search, bank, accounting and attorney fees—$10,558.32.'" She asked what "search" had been conducted and requested detailed information regarding the names of people performing each function, work performed, and fees. Specifically, she asked for an itemization of attorney's fees. Respondent's only response to those requests informed Mrs. Sawulak that the minimum fee contemplated by the retainer agreement was $18,000, and that itemized statements would be provided when the paid fees exceeded that amount. Unknown to Mrs. Sawulak, however, respondent had already withdrawn from the estate account $20,000 in legal fees. At no time did respondent provide to Mrs. Sawulak an itemized statement of his legal fees.

The correspondence reveals that by the end of February 1990, Mrs. Sawulak wanted to sell the Hackettstown house. The letters also suggest some question concerning the house's marketability. Mrs. Sawulak wished to sell the property "as is." However, sometime in February 1990, respondent obtained a preliminary report from a title company indicating that the deed covered only a portion of the Hackettstown property. On February 20, respondent informed Mrs. Sawulak that "[t]he property cannot be sold with the present title problems[,]" and "[t]here will be additional fees for an Action to Quiet the Title to this property." He assured her that his "office [had] commenced the necessary work to clear the title to the real property, so that it may be transferred to you or the public [sic] buyer. I will keep you informed of progress. It will take well over a year to complete."

Mrs. Sawulak's response was one of surprise and confusion: "I would like to know how come you state that you have to clear title and it takes a year to complete? How come that you are selling the property now? When is the year up?" The only response in

the record is a letter dated April 4, 1990, in which respondent reiterated that there was a defect in the title that needed to be cleared before the property could be sold.

Shortly thereafter, respondent informed Mrs. Sawulak that an action to quiet title would cost an additional $25,000. Unwilling to pay that fee, Mrs. Sawulak retained a new attorney. Through that attorney, she instituted a civil suit against respondent. In connection with that suit, Mrs. Sawulak learned that respondent had paid himself $32,202.34 in counsel fees, amounting to almost 75% of the total disbursements made from the estate account. She also discovered that respondent had obtained a $25,000 home-equity loan on behalf of the estate, secured by the Hackettstown residence, a substantial portion of which had been used to pay counsel fees.

Additionally, in the course of the civil action Mrs. Sawulak obtained time sheets related to respondent's representation. Respondent testified that he had prepared the time sheets "simultaneously or within a few minutes after [he had] performed the work * * *." He also stated that the times were approximations. The DEC summarized some of the notable entries:

On September 27, four different charges against the estate (C–11, page 2) are charged: 1½ hours on a receipt of a letter from a client; 1½ hours for a letter with the Agreement to the client, two separate charges of 1½ hours for receipt of a letter from Mrs. Sawulak and a separate ½ hour charge for the receipt of a letter also from Mrs. Sawulak. The Respondent indicated that there may have been a "duplication" in these charges. On October 3rd, the estate is charged with 3½ hours for a conference with Mrs. Sawulak at the Hackettstown residence and the execution of the Retainer Agreement; a separate 4½ hour charge is made for a telephone conference with the client and a separate 1¾ conference charge is made for a conference with a creditor of the estate—before it had even been admitted to probate. On October 5, 1989, two separate charges are made for conferences with the client; one of 3¾ hours and a separate charge for 3½ hours. A separate charge against the estate on the same date is made for drafting of the Power of Attorney for 3¾ hours. * * * In his time sheets (C–11), the Respondent has ten listings for the County Clerk's office or the law library, totaling 74¾ hours.

The issues [respondent] indicated he was researching were: whether the 82 year old deceased had started a divorce action against his wife, (although no papers had ever been served on Mrs. Sawulak)—the Respondent indicated that because of her age he could not accept her word; the question of illegitimate children and laws of intestacy.

Other time-sheet entries require separate mention. Entries for two different days, October 19 and November 13, reflect time charges of over eleven hours on each day. The time sheets indicate that respondent spent a minimum of twenty-two-and-one-half hours searching the title to the Hackettstown property. Also, the time sheets reflect that from October 1989 through March 1990, respondent inspected the property forty times, each inspection resulting in a forty-five minute time charge for services rendered to the estate. In testimony before the DEC, respondent acknowledged and defended the time spent inspecting the house, asserting that his primary purpose had been to make certain that the heating system was operational in order to be assured that the house would not sustain damage because of frozen pipes. According to respondent's time sheets, he continued to inspect the property for several months after Mrs. Sawulak had instructed him to stop. Respondent asserted that the inspections were an integral part of his overall responsibilities to the estate. Respondent also acknowledged that some time-sheet entries had not been recorded contemporaneously with the work performed, and that the time charges had been estimated. Several other entries do not indicate what work had been performed. Finally, respondent admitted that there may have been duplicate time sheets, but that on other occasions he had performed work without charging for it.

## II

The DEC concluded that

[t]he Respondent failed to keep his client reasonably informed concerning the status of the matter and did not comply with reasonable requests for information. The Respondent failed to acknowledge requests to cease inspection of the premises, and despite the Administratrix' direct wishes, he imposed on her to forego private care for the real estate by friends and neighbors and interposed himself as a caretaker. He also failed to provide itemized bills when requested, failed to inform the Administratrix he was proceeding to obtain [sic] equity loan, against her instructions; he failed to inform her as to his specific fees to be charged to the estate and he failed to disclose fully and fairly the lack of complexity of the estate involved, leading her to believe that the matter was substantially more involved than it actually was.

The DEC relied on those factual determinations to conclude that respondent had violated RPC 1.4(a) (failure to keep client reasonably informed and promptly to comply with information requests), and RPC 1.4(b) (failure to explain matters involved adequately so that client may make informed decisions regarding representation). Similarly, respondent's failure to cease inspections and to provide itemized statements of his fees constituted the basis for the DEC's finding of a violation of RPC 1.2(a).

The DEC further found by "clear and convincing evidence that the amount of the fee was not communicated specifically to the client at any time." In that regard, the DEC rejected respondent's assertion that letters were mailed informing Mrs. Sawulak of the hourly rate. The DEC found inconsistent with that assertion the "excision in the Retainer Agreement * * * of the hourly rate provisions * * *."

The DEC reserved its most severe criticism for respondent's paying himself over $32,000 for his work related to an estate valued at approximately $300,000. The DEC specifically found that the "time sheets [had been] created by the Respondent for the sole purpose of justifying fees and that they do not reflect a true character of any work that might have been involved." Furthermore, the fee agreement incorporated an arrangement not based on reasonable rates reflecting the work involved. The DEC concluded that "[m]erely to characterize [the] fees as excessive [ ] would be a minimization of the actions of the Respondent in this matter. The Respondent's fees charged are so unreasonable * * * as to constitute an outrage on the client." Ultimately, the DEC believed that the respondent had "systematically drained the estate account."

Finally, with respect to RPC 8.4(c), the DEC stated:

The Panel finds, by clear and convincing evidence, that the conduct engaged in by the Respondent in imposing an unreasonable and unenforceable Retainer Agreement on the Estate of Peter Sawulak; his creation of time records that are so unwarrantedly large; his representation of problems in the estate that were unwarranted or ordinary * * *. His assertions and imposition of acts to be done by him so unwarranted as to present a picture of engorged avarice. His fees in

excess of $32,000, to an estate that was otherwise very ordinary, constitutes a fraud based on misrepresentation, and was obtained by deceit.

The DRB essentially adopted the conclusions of the DEC. The DRB characterized respondent's violation of *RPC* 1.5(a) as "egregious" and as an exploitation "of an inexperienced elderly widow."

With respect to *RPC* 8.4(c), the DRB determined that respondent had "fabricat[ed] * * * evidence to the DEC and the Board." The DRB rejected respondent's assertion that inaccuracies in the time sheets were errors. Rather, the DRB concluded, as did the DEC, that the "time sheets were created simply to justify [respondent's] fee."

For the same reason, the DRB found that respondent had violated *RPC* 8.4(d):

> The Board is convinced that respondent lied to the DEC and created his time sheets to justify his outrageous fee and/or in anticipation of the disciplinary hearing. His deceitful conduct toward his client was compounded by his attempt to defraud the disciplinary system and accordingly, the Board finds a violation of *RPC* 8.4(d). The Board also is convinced that the letters respondent allegedly sent to Mrs. Sawulak regarding his fee, particularly the letter explaining his hourly rate, are not authentic. It would appear from the facts established in the record that, contrary to respondent's testimony, the letters were, at best, drafted and never sent or, more likely, created in anticipation of the disciplinary proceeding and/or the civil action.

Based on those conclusions, the DRB recommended a three-year suspension, although two members believed disbarment was the appropriate discipline.

### III

Our independent review of the record leads us to conclude that the ethical violations described above have been established by clear and convincing proof. We offer the following observations, based on our independent review of the record, to set forth more fully our conclusions concerning respondent's ethical deviations.

The DEC and DRB both concluded that respondent had violated *RPC* 1.4(a) and *RPC* 1.4(b) by obtaining the $25,000 home-equity loan without authorization. Indeed, respondent has acknowledged that he has "a moral obligation," if not a legal one, to

repay to the bank the principal of the loan, and in connection with the civil litigation, has offered to repay the principal in full settlement of the suit.

We are satisfied that the record clearly and convincingly proves that Mrs. Sawulak explicitly refused to authorize respondent to obtain the home-equity loan. We also concur with the DEC and DRB that Mrs. Sawulak never received the letter purportedly sent by respondent informing her of the loan. That conclusion is amply supported by correspondence from Mrs. Sawulak to respondent inquiring about payments from the estate account to an undisclosed bank. Based on those findings, we conclude that respondent violated *RPC* 1.2(a), by failing to abide by his client's decisions concerning the objectives of the representation, and *RPC* 1.4(a), by failing to keep his client reasonably informed about the status of the matter. The seriousness of those violations is exacerbated by respondent's obvious motivation for disregarding Mrs. Sawulak's instructions, and for proceeding to obtain the home-equity loan without authority. Respondent used the loan proceeds to pay himself excessive, unjustified, and unauthorized legal fees, and without the loan proceeds the Estate account would not have been sufficient to permit such payments to respondent. Respondent's conduct in respect of the home-equity loan was flagrantly improper and alone warrants severe discipline.

The record also demonstrates that Mrs. Sawulak instructed respondent to cease inspecting the property. Respondent admits having been so informed, and despite that instruction, having continued to inspect the property to satisfy his obligation to the estate. We conclude that respondent was required, pursuant to *RPC* 1.2(a), to abide by his client's directions and to stop inspecting the property. By failing to abide by that instruction, respondent violated *RPC* 1.2(a).

With respect to the issue of respondent's fees for legal services rendered to the estate, the proofs establish that respondent received over $32,000 in fees for the administration of an

estate valued at approximately $300,000. Based on clear and convincing evidence in the record, we are fully persuaded that such fees were utterly unreasonable and inconsistent with the factors relevant to the determination of reasonableness of legal fees, in violation of *RPC* 1.5(a). We also are in accord with the DRB's determination that respondent violated *RPC* 1.5(b), in failing to communicate the basis of his fee to Mrs. Sawulak. That violation consisted not only of respondent's failure to transmit to his client the letter setting forth his anticipated hourly rate but, even more egregious, his failure to obtain the client's approval of his bills and his unauthorized withdrawal of estate funds to pay excessive and unauthorized fees. *See In re Stein*, 97 *N.J.* 550, 564, 483 *A.*2d 109 (1984) ("A client must be given notice before a fee can be taken from his account."). The impropriety of respondent's unauthorized withdrawal of funds to pay his legal fees is exacerbated by respondent's misconduct in mortgaging the Hackettstown residence without authorization to generate funds for the payment of those fees. Respondent's withdrawal of estate funds without authorization to pay legal fees not approved by the administratrix of the estate also constitutes a violation of *RPC* 8.4(c) (engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation).

We also adopt the findings of the DEC and DRB that respondent's overstated and exaggerated time sheets reflect conduct involving misrepresentation and deceit prejudicial to the administration of justice, in violation of *RPC* 8.4(c) and (d). We share the view that the time charges reflected in respondent's time sheets bear no reasonable relationship to the responsibilities realistically imposed on respondent in the administration of the estate. Many time sheet entries are so clearly disproportionate to the service described that an inference of deceit is justifiable. In addition, we discern from respondent's testimony not only that his time records were unreliable and inflated, but that they improperly included the time spent by respondent's wife, who functioned as his secretary, in the preparation of correspondence. We acknowl-

edge, based on the testimony of Mrs. Sawulak and respondent, that some aspects of the estate's administration were unusual, specifically the apparent disparity between the acreage attributed to the Hackettstown property and that reflected in the deed, as well as the apparent hostility that had existed between Mrs. Sawulak and the decedent, and that continued to exist between Mrs. Sawulak and decedent's sister. We also infer from respondent's testimony that respondent may have misapprehended to some extent the reasonable scope of his responsibilities, and may have performed wasteful and unnecessary legal services out of a misguided view concerning the perceived complexity of issues requiring attention in connection with the estate. Nevertheless, we are fully satisfied that most of the time charges are overstated and excessive, and that clear and convincing evidence demonstrates that their overstatement is the product of recklessness or deceit, as opposed to deficiencies in respondent's legal analysis. In analogous circumstances we have concluded that the reckless or deceitful preparation of billing records and statements of services amounts to knowing misrepresentation, *In re Cohen*, 114 *N.J.* 51, 64, 552 *A.2d* 985 (1989), and constitutes a blatant violation of an attorney's obligation to his client. *In re Wolk*, 82 *N.J.* 326, 327, 413 *A.2d* 317 (1980).

## IV

Well settled is the principle that "the primary reason for discipline is not to punish the attorney but to protect the public against members of the bar who are unworthy of their trust." *In re Lunn*, 118 *N.J.* 163, 167, 570 *A.2d* 940 (1990). To determine the appropriate discipline we consider the interests of the public, the bar, and respondent, keeping in mind that the inquiry remains a fact-sensitive one. *In re Kushner*, 101 *N.J.* 397, 400, 502 *A.2d* 32 (1986).

Although respondent's ethical violations arose from his involvement in one matter, the violations were numerous. The DRB found most egregious respondent's overcharges, his fabrication of

time sheets and letters, and his presentation of those documents to it and the DEC as authentic. According to the DRB, that conduct constituted violations of *RPC*s 1.5(a), 8.4(c), and 8.4(d). Based on those findings, the DRB recommended a three-year suspension, notwithstanding two members' recommendations for disbarment.

We have disbarred or imposed lengthy suspensions on attorneys who knowingly have misrepresented the amount and value of services provided. See *Cohen, supra,* 114 *N.J.* 51, 552 *A.2d* 985 (adopting findings and recommendations of DRB, imposing one-year suspension where attorney recklessly had prepared statement of services, where six months had passed since transgression, and where attorney had engaged in conflict of interest and had failed to pursue matters diligently, to keep client informed, and to comply with requests for information); *In re Hecker,* 109 *N.J.* 539, 538 *A.2d* 354 (1988) (imposing six-month suspension on municipal attorney who had billed for services not rendered, had concealed personal assets to avoid civil judgment, had instituted harassing litigation, and had engaged in conflicts of interest); *In re Wolk, supra,* 82 *N.J.* 326, 413 *A.2d* 317 (disbarring attorney who had submitted fraudulent affidavit of services to court and had failed to disclose value of property in which he advised client to invest and in which he had interest). We have concluded that the record clearly and convincingly proves that respondent not only knowingly misrepresented the value of his services, but also that his fees, over $32,000 for the administration of an estate valued at approximately $300,000, were excessive and unreasonable in violation of *RPC* 1.5(a). Mrs. Sawulak entrusted representation of the estate to respondent, and she was entitled to assume that respondent was performing only the work reasonably necessary to further the objectives of the representation. The time sheets, however, reflect work performed by respondent that we would characterize as wasteful, excessive, and unnecessary. That violation alone calls for substantial discipline. *See In re Hinnant,* 121 *N.J.* 395, 580 *A.2d* 271 (1990) (adopting report of DRB and imposing public reprimand of attorney who had charged fees

amounting to overreaching and had engaged in conflict of interest).

More egregious than respondent's overreaching in respect of the quantity of work charged to the estate was his withdrawal of more than $32,000 from the estate account as attorney's fees without informing Mrs. Sawulak and without her authorization, in violation of *RPC* 1.5(b) and *RPC* 8.4(c). A substantial portion of those fees was paid from funds obtained by respondent by mortgaging the Hackettstown property, against the express instructions of Mrs. Sawulak. In both instances, respondent disregarded his ethical responsibilities to his client, conduct that cannot be condoned. *See In re Vaughn*, 123 *N.J.* 576, 589 *A.*2d 610 (1991) (adopting DRB's recommendation publicly to reprimand attorney who had taken fees without notice or authorization, had failed to provide formal accounting, to keep client informed, and to act with due diligence; had displayed pattern of neglect; and had failed to reply to DEC investigator); *Stein, supra*, 97 *N.J.* at 564, 483 *A.*2d 109.

■ Respondent's misconduct was compounded by his failure reasonably to inform Mrs. Sawulak that he was withdrawing money from the estate account to pay his fees and promptly to comply with her requests for itemized statements and other information related to the administration of the estate. As we have stated, an attorney has the duty "to advise the client fully, frankly, and truthfully of all material and significant information." *In re Loring*, 73 *N.J.* 282, 290, 374 *A.*2d 466 (1977). The failure to do so "diminishes the confidence the public should expect from a member of the Bar." *Stein, supra*, 97 *N.J.* at 563, 483 *A.*2d 109.

■ In respect of respondent's exaggerated time-sheet entries, the DEC took specific note, for example, of time charges of one-and-one-half hours attributed to the receipt of a letter from the client, and of three-and-three-quarter hours for drafting a power of attorney, as illustrations of deceitful time records. Whether characterized as deceitful or reckless, such irresponsible time charges constitute a flagrant breach of the attorney-client relation-

ship. If recorded with the intent to deceive clients and to support payment of unjustifiably-high fees, exaggerated time charges alone could in certain circumstances justify imposition of substantial discipline. *See Wolk, supra,* 82 *N.J.* 326, 413 *A.*2d 317. In this matter, not only were respondent's time charges excessive, but respondent obtained without authorization estate funds with which to pay his inflated fees, and also established a single-signature estate bank account enabling him to sign estate checks without client authorization in payment of his own invoices. Respondent's entire course of conduct in respect of his compensation for services from this estate was blatantly improper and unethical.

Respondent's serious violations bear directly on his ability to justify and sustain the trust of prospective clients. Respondent's extensive misconduct warrants severe discipline. The DRB observed that although respondent acknowledged the "moral obligation" to repay the estate's bank loan, respondent had not acknowledged that his fees to the estate were excessive. We are persuaded that the record clearly and convincingly demonstrates that respondent took unfair and improper advantage of his client for his own benefit, and that the extent and severity of respondent's misconduct is such that the appropriate discipline is disbarment. We also impose on respondent the obligation to reimburse the Ethics Financial Committee for appropriate administrative costs.

So ordered.

WILENTZ, C.J., and CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN, JJ., join in this opinion.

*For disbarment* —Chief Justice WILENTZ, and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*Opposed* —None.

## ORDER

It is ORDERED that DAVID C. ORT of Hackettstown, who was admitted to the bar of this State in 1970 and who was thereafter temporarily suspended from practice on September 21, 1993, and who remains suspended at this time, be disbarred and that his name be stricken from the roll of attorneys of this State, effective immediately; and it is further

ORDERED that DAVID C. ORT be and hereby is permanently restrained and enjoined from practicing law; and it is further

ORDERED that DAVID C. ORT comply with Administrative Guideline No. 23 of the Office of Attorney Ethics dealing with disbarred attorneys; and it is further

ORDERED that DAVID C. ORT reimburse the Ethics Financial Committee for appropriate administrative costs.