684 A.2d 1362

IN THE MATTER OF F. WILLIAM LA VIGNE, AN ATTORNEY AT LAW.

Argued June 20, 1995—Reargued September 24, 1996—Decided November 15, 1996.

*John J. Janasie*, First Assistant Ethics Counsel, argued the cause on behalf of Office of Attorney Ethics.

*S.M. Chris Franzblau* argued the cause for respondent (*Franzblau & Dratch*, attorneys).

PER CURIAM.

This matter arises from a Report and Recommendation of the Disciplinary Review Board (DRB) that F. William LaVigne (respondent) be disbarred for his unethical conduct in connection

with a series of related real estate transactions. This case illustrates the pitfalls that arise when a lawyer does not carefully observe the lines that distinguish the relationships of friend, business associate, and client. Specifically, this case illustrates how closely a lawyer may come to disbarment if the lawyer does not secure and follow explicit instructions from a client concerning the use of a client's funds. The transaction involved the sale of a client's farm to respondent in exchange for cash and for two building lots upon which homes would be built for the client's sons. The concept is simple but its implementation was complex. The Office of Attorney Ethics provides a summary of the transaction.

## I

The Kayhart Farm is a twelve-acre property contiguous to the quarry of a sand and gravel company owned by respondent on Lenape Road in Andover Township, New Jersey. Robert DuPont, Sr. (DuPont, Sr.) acquired the Kayhart Farm from Mrs. Charlotte Kayhart in 1986. DuPont, Sr. bought the property for the use of his two sons, James and Robert, Jr., who occupied the two-family house on the farm. Over time, the sons' families grew, and they wanted homes of their own. The DuPonts explored the possibility of subdividing the Kayhart Farm and building separate dwellings on the subdivided lots.

Respondent had represented DuPont, Sr. in some business matters and was a social acquaintance of the family. When he learned of the plans to subdivide the Kayhart Farm, he approached the DuPont family with a proposal to acquire it. Ownership of the farm was desirable because it would provide respondent with additional land for his quarry. Respondent owned other residential parcels in Andover on which new homes were being built by Cranberry Builders, Inc. (Cranberry). Negotiations resulted in an agreement under which respondent would acquire the Kayhart Farm from DuPont, Sr. and the two DuPont sons, James and Robert, Jr., would purchase homes built by Cranberry on lots

owned by respondent. Each transaction was a part of one package; all had to happen, or none.

The basic transaction, whatever the senior DuPonts' tax objective may have been, involved the sale by them of the Kayhart Farm to respondent in exchange for $175,000 plus two residential lots, 6.01 and 6.02, worth $230,000, to be deeded without cost to the two DuPont sons. Respondent was to arrange for homes to be built on the lots by Cranberry, whose owner, Doug Ferry (Ferry), was a long time friend and client. The sons were to pay for the cost of constructing the houses but not the land, which they were to receive free and clear. The transaction was documented by three contracts, all dated April 29, 1988, and all prepared by respondent, although the senior DuPonts had consulted with Raymond Obssuth, independent tax counsel.[1] The Kayhart Farm contract reflected a sale price of $175,000, without reference to the lots and homes for the DuPont sons. On the same date, Ferry's company, Cranberry, signed separate contracts with James and Yolanda DuPont and with Robert and Cecelia DuPont. The first contract required Cranberry to build a house on lot 6.02 having an aggregate value of $318,900, and to convey the house and lot to James and Yolanda for $203,900, the difference of $115,000 representing the value of the lot, part of the consideration payable by respondent for the Kayhart Farm. Similarly, the second contract required Cranberry to build a house on lot 6.01 having an aggregate value of $339,000, and to convey the house and lot to Robert and Cecelia for $224,000, the difference of $115,000 equalling the balance due from respondent for the Kayhart Farm.

---

[1] Tracing these related transactions is difficult and we have attempted to set them forth, for convenience, in graphic form in the appendix to this opinion. The monetary figures have been rounded off and the steps portrayed in the graphic chart are not in exact chronological order. For example, LaVigne had placed the two lots in Cranberry's name before he finalized the deal with DuPont, Sr., and Cranberry had obtained its construction loans before it made its deal with the DuPont sons. The chart portrays the conceptual implementation of the planned swaps.

Respondent was required to transfer lots 6.01 and 6.02 to Cranberry, but those lots, owned by respondent's company, Good Earth, Inc. (Good Earth), were subject to a $300,000 blanket mortgage held by Sussex County State Bank (Sussex), which apparently required collateral of $100,000 to release the two lots from the mortgage. Although respondent was obligated to transfer those lots to Cranberry free and clear, he arranged a more complicated transaction with Cranberry. Respondent conveyed to Cranberry *three* lots, lot 6.01, lot 6.02, and lot 5, (and may have agreed to convey additional lots), and in return Cranberry issued a note to respondent for $100,000 secured by a mortgage on lot 6.02, which respondent assigned to Sussex in return for the release of lots 6.01, 6.02, and 5 from Sussex's blanket mortgage. Thus, respondent kept his commitment to transfer lots 6.01 and 6.02 to Cranberry, and conveyed lot 5 (and possibly additional lots) to reimburse Cranberry for the $100,000 note and mortgage it issued on lot 6.02. In that way, respondent ensured that his transaction with Cranberry carried sufficient value to satisfy respondent's obligations concerning the lots destined for James and Robert DuPont.

To finance construction of the two homes, Cranberry borrowed $200,000 for each house from Kenvil Mortgage Company (Kenvil), whose affiliate, Roxbury Lumber Company, sold building supplies to Cranberry. Kenvil's loans were secured by mortgages on both lots, and other Kenvil loans to Cranberry were secured by mortgages on other properties. Cranberry had maintained good business relationships with Kenvil for several years, and respondent had represented Cranberry in numerous transactions involving property encumbered by mortgages to Kenvil.

On September 30, 1988, the closing took place on lot 6.02, which was then encumbered by a $200,000 mortgage to Kenvil and a $100,000 mortgage to Sussex. The closing proceeds of approximately $203,900 (excluding extras) were obviously insufficient to satisfy the mortgages. Ferry informed respondent that he had reached an agreement with Kenvil to accept $100,000 in exchange

for releasing entirely its mortgage on lot 6.02, in return for which Ferry would mortgage additional Cranberry property to secure the $100,000 balance due to Kenvil. Respondent relied on Ferry's representation without obtaining confirmation from Kenvil. Out of the closing proceeds, $100,000 was used to pay off the Sussex mortgage and $100,000 was used to reduce the outstanding balance on the Kenvil loan and trigger Kenvil's agreement to release the lien on lot 6.02 and transfer that lien to other Cranberry property. Assuming that satisfaction of the full Kenvil mortgage would be received in due course, respondent completed the closing, prepared a RESPA statement (a federally required disclosure statement that sets forth items of receipt and disbursement at a real estate closing) that reflected the pay-off of only a $100,000 loan from Kenvil, and certified to National Community Bank, James and Yolanda's lender, that it had a valid first mortgage lien on lot 6.02.

Despite its agreement, Kenvil failed to release its lien on lot 6.02. Between the closing on lot 6.02 and the impending closing on lot 6.01, respondent spoke regularly with Ferry about Kenvil's refusal to release its lien. Ferry informed respondent that Kenvil was "working on it," and that Kenvil was involved in a refinancing and would release the mortgage when that was completed.

The closing on lot 6.01 occurred on May 25, 1989. In April 1989, respondent wrote Kenvil requesting mortgage payoff statements on lots 6.01 and 6.02. Kenvil responded, stating that the balance due on lot 6.01 (Robert and Cecelia's lot) was $208,194.16 and the balance on lot 6.02 was $117,609.85, including accrued interest, and reflecting a credit for the $100,000 paid at the prior closing. Ferry previously had informed respondent that he now had a firm agreement from Kenvil that it would discharge its mortgages on *both* lots 6.01 and 6.02 if at the forthcoming closing Cranberry would pay off the balance of the loan on lot *6.02* (James' and Yolanda's lot) as well as the interest due Kenvil on other Cranberry mortgage loans. In exchange, Cranberry would

provide additional collateral to secure its unpaid indebtedness to Kenvil.

Again, respondent failed to obtain written confirmation of that understanding. Although the proceeds at the closing of lot 6.01 were sufficient to pay off Kenvil's lien on *that* lot in full, the bulk of the proceeds, reflecting Ferry's new arrangement with Kenvil, were used to pay off the balance due on lot 6.02. Thus, respondent "misused" the closing proceeds from lot 6.01 and applied them as follows: (1) $117,609.85 to pay off the Kenvil mortgage on lot 6.02, with interest to May 23, 1989; (2) $368.96 to pay the interest on lot 6.02 through May 31, 1989; (3) $22,239.16 to pay interest due Kenvil on other Cranberry properties (including $11,972.35 in interest due on lot 6.01, the subject of the closing); (4) $10,000 to Cranberry (out of what respondent described as excess cash); and (5) miscellaneous small disbursements. Respondent personally delivered the checks to Kenvil, informing one of the principals of Kenvil that he expected to receive in exchange discharges of the Kenvil mortgages on both lots 6.01 and 6.02. Although Kenvil reflected on its books that the loan secured by the mortgage on lot 6.02 was paid in full, it refused to discharge *either* mortgage.

After the closing, respondent failed to inform either Robert or James of the problems that had developed. He also transmitted to the title company and National Community Bank certifications that Robert and Cecelia's lot 6.01 was unencumbered except for the National Community Bank's purchase money mortgage.

When the passage of several months confirmed that Kenvil would not honor its agreement with Ferry, respondent and Ferry met in January 1990 with two Kenvil partners and their lawyer, Ronald Kevitz (Kevitz). According to respondent, Kenvil initially insisted on additional collateral as a condition of releasing its liens. Respondent then executed a mortgage to Cranberry on property owned by Good Earth to increase the value of Cranberry's collateral, and Cranberry executed a blanket mortgage to Kenvil covering all its land as collateral for a $973,000 note. Kenvil still

refused to release its liens, and informed Ferry and respondent that it now required additional cash in order to discharge the mortgages.

Accordingly, respondent borrowed $96,596 and Ferry borrowed $104,357.30. Respondent's trust account check to Kenvil contained a notation that the money was to satisfy the mortgage on lot 6.01 (Robert and Cecelia's lot), but Kenvil refused to accept the check. A new check was delivered to Kenvil without any condition. Kenvil, however, applied the $200,000 payment to properties covered by Cranberry's blanket mortgage other than lot 6.01 and continued to refuse to release its liens.

In 1990, Kenvil instituted a foreclosure action seeking to foreclose its mortgage on lot 6.01. In an unpublished opinion dated August 4, 1993, the Chancery Division made the following findings:

> A meeting took place in January 1990 involving Roy Solondz and Stanley Levitt of Kenvil, Ronald Kevitz, Esq., Kenvil's attorney, LaVigne, and Donald Ferry of Cranberry. The overall status of all Kenvil loans to Cranberry was discussed, but a special concern was the mortgage of Lot 6.01. The approximate sum of $200,000 was then due on Lot 6.01. An agreement was struck for the release of Kenvil's mortgage on Lot 6.01 and in reliance on that agreement both LaVigne and Ferry borrowed money from third parties. LaVigne raised $96,596 from American Business Credit and a check in that sum was tendered to Kenvil. As to the agreement, the testimony of Ferry, LaVigne and Kevitz on January 5, 1993 was believable. Ferry refinanced his home and tendered $104,357.30 to Kenvil. Instead of applying the two checks to pay off the mortgage on Lot 6.01, Kenvil unilaterally and self-servingly applied the $200,943.30 to other loans. None of the proceeds were applied against Lot 6.01.

> The evidence showed that more than sufficient moneys were paid on behalf of both DuPont families to satisfy the two Kenvil mortgages. Specifically, I am satisfied that the following moneys were intended by LaVigne and Ferry to be applied toward the loans on Lots 6.01 and 6.02:

| | |
|---|---:|
| October 7, 1988 | $ 100,000.00 |
| May 30, 1989 | 117,609.85 |
| May 31, 1989 | 398.96 |
| June 17, 1989 | 11,972.35 |
| April 19, 1990 | 96,596.00 |
| June 6, 1990 | 104,357.30 |
| | $ 430,934.46 |

Kenvil clearly accepted the first four payments on account of either Lot 6.01 or 6.02, and promised at the January 1990 meeting to apply the last two checks as against Lot 6.01. Under these circumstances, Kenvil cannot be permitted to deny its agreement and its obligation to discharge both mortgages. James/Yolanda and Robert/Cecelia, who are all totally innocent parties, are entitled to a cancellation of the respective mortgages against their properties. NCB is entitled to first mortgagee status on both Lots. Kenvil is not entitled to a judgment of foreclosure as to Lot 6.01, or Lot 6.02 as to which, in fairness to plaintiff, that relief was not sought.

Kenvil's refusal to discharge without justification the mortgages constitutes a slander of title on each DuPont property. Kenvil's refusal is more egregious, outrageous and malicious with respect to Lot 6.02 which it concedes was paid in full. The refusal to cancel the 6.01 Lot mortgage was intentional and wrongfully motivated although not as egregious in comparison to the other lot. In both instances, Kenvil demonstrated a wanton and wilful disregard for the rights of the DuPonts.

The Chancery Division also stated that it "accepted as truthful the testimony of the two DuPonts, Ferry, respondent and Kevitz on all critical issues." The Chancery Division awarded the Du-Ponts punitive damages of $35,000 against Kenvil and $50,000 against respondent, and ordered the Kenvil mortgages on lots 6.01 and 6.02 discharged. The court determined that the DuPonts had not proved any right to recover compensatory damages from respondent.

As a result of the Chancery Division's judgment, James and Yolanda DuPont and Robert and Cecelia DuPont have obtained good title to their properties, subject only to the lien of their purchase money mortgages, and have been awarded punitive damages because of Kenvil's wilful refusal to perform its agreement to release its liens, and because of respondent's egregious misconduct.

## II

The multiple and conflicting representations that respondent undertook in the course of the land swap sealed his fate. He was the only attorney involved in the actual negotiations and real estate transactions. Obssuth counseled DuPont, Sr. regarding only the tax consequences of the deal. The record suggests that

both DuPont sons believed that respondent was representing them. Respondent's conduct confirmed that belief. Likewise, respondent represented Cranberry, the seller, and its principal, Douglas Ferry, with whom respondent had a long-standing personal and professional relationship.

As determined by the Special Master (Master) and the DRB, respondent represented the senior DuPonts and himself in the Kayhart Farm transaction, and also represented the DuPont sons and spouses as well as Cranberry in the new home transactions, all without disclosing his adverse interests, without obtaining their written consent, and without advising them to consult with independent counsel as required by RPCs 1.7 and 1.8. Respondent's violations of the RPCs are incontestable. Fairly viewed, however, given the origins of the transaction, the likelihood that Cranberry, as well as the DuPonts, would have consented to respondent's multiple representation is strong. Doug Ferry was a friend and client for twenty years. James DuPont testified that "it was a good honest deal for both parties and that it was a good swap," and Robert DuPont testified that respondent did not charge for his legal services in the transaction. Because consent was not obtained, we need not determine whether this constituted a "complex commercial real estate transaction" in which an attorney is barred from representing both buyer and seller even with their consent. *See Baldasarre v. Butler,* 132 *N.J.* 278, 295–96, 625 *A.*2d 458 (1993).

In addition, respondent failed to keep his various clients completely informed of developments that detrimentally affected their interests. Whether it was his long-time association with Cranberry, Doug Ferry, or local banks that he did not wish to jeopardize, or his self-interest in keeping the Kayhart Farm, respondent never advised any of the DuPonts of the complications that arose with respect to their acquisitions. The DuPonts did not begin to learn of all the problems saddling these transactions until discovery proceedings in civil litigation that led to the Chancery Division cancellation of the Kenvil mortgages. DuPont, Sr. and Robert

DuPont, Jr. both testified that respondent ignored their requests for information, even after they had been informed by Kenvil, which provided construction financing to Cranberry, that it intended to foreclose its mortgage on Robert, Jr.'s property.

Respondent handled all of the DuPont transactions in a misleading fashion, never explaining to either James or Robert, Jr., or their respective wives, Yolanda and Cecelia, the nature of the disbursements that were reflected on the RESPA forms. In fact, the funds were not disbursed as respondent indicated on the RESPA forms. For example, respondent prepared a RESPA statement for James and Yolanda's closing (the first closing) that showed a $100,000 construction loan held by Kenvil when the mortgage was, in fact, $200,000. Respondent contends that theoretically this representation would have been accurate had Kenvil kept its promise to transfer the remaining $100,000 of the lien to a different Cranberry property after it was paid $100,000 of the closing proceeds.

In the case of the closing for Robert, Jr. and Cecelia, without their knowledge or consent, respondent dealt with their funds much as he saw fit. He used $117,000 of their mortgage proceeds to pay off the balance due on the Kenvil lien on James' property. Respondent claims that he was relying in good faith upon representations made to him by Doug Ferry that an agreement was being negotiated with Kenvil; however, he had no personal conversations with any of the principals of Kenvil prior to the closings, nor did he confirm in writing any of the supposed agreements that had been reached. Respondent acknowledged that he gave Kenvil no formal notice of the September 30, 1988, closing on James and Yolanda's property.

Respondent falsely certified to title companies and to the mortgagee banks that he had transferred clear title to the DuPonts, that all prior liens had been satisfied, and that the purchase money mortgages were in place on the DuPont properties. The affidavits of title prepared and submitted by respondent and his representations to all parties were untrue. In the May 25, 1989

closing on Robert, Jr. and Cecelia's property, instead of utilizing their mortgage proceeds to pay off the existing liens on their property, respondent used the funds to pay off the outstanding mortgage on James and Yolanda's lot as well as construction loan interest on a lot unrelated to the DuPont transactions. Even more egregiously, he disbursed $10,000 to Cranberry after the closing, although it had failed to bring more than $30,000 to the closing as required to satisfy various liens.

### III

After reviewing all the evidence, the Special Master reached the "inescapable" conclusion that respondent committed numerous violations of the Rules of Professional Conduct. The Master found clear and convincing evidence that respondent had entered these transactions with an evident self-interest and that his obligations to the DuPonts to transact their purchases so that any prior liens would be satisfied, to Cranberry to discharge any debts attendant to development and to the purchase-money lenders to see that the loan funds assumed a first priority position were totally unfulfilled. In addition, the entire flawed transaction was colored by respondent's self-interest in acquiring the Kayhart Farm for himself. The Master found that respondent neglected to explain the significance of this potential conflict of interest to James and Yolanda or Robert, Jr. and Cecelia and failed properly to seek their consent to multiple representation. This conduct amounts to a plain violation of *RPC* 1.7(b), which prohibits an attorney from acting with a conflict of interest absent a full disclosure of the conflicting interests. The Master also found a violation of *RPC* 1.15(a) and (b) because the purchase monies of James and Yolanda and Robert, Jr. and Cecelia were entrusted to respondent to effectuate their purchases free and clear of liens other than their new mortgages. That did not happen in either transaction. The expectation that Kenvil would transfer to other Cranberry properties its unsatisfied mortgage on the Robert, Jr. and Cecelia lot was neither documented nor realized. The Master

found that this expectation did not excuse the fact that the purchase monies entrusted to respondent were used as part of an overall plan to realign Cranberry's debts and only indirectly to permit the DuPont sons to acquire clear title.

The Master also found an extended course of deceit, dishonesty, and misrepresentation in that respondent did not disclose to his purchaser-clients how their monies were being used; he did not disclose to Kenvil, in September 1988, that a closing was taking place on lot 6.02; and he represented to the mortgage lender that its mortgages constituted valid first liens when that was not the case. Finally, even though he determined that the facts presented did not reflect any intent by respondent to steal, the Master concluded that there was a fundamental problem with how and when respondent used the funds. The Master found clear and convincing evidence that respondent used client funds in an unauthorized manner on two separate occasions. The clearest occasion was in the second, or Robert, Jr. and Cecelia purchase. Respondent used the proceeds from that closing to clear James and Yolanda's liens, knowing that those funds were intended for Robert, Jr. and Cecelia's purchase only. "Viewed thusly," the Master concluded, "[r]espondent knowingly used client funds for purposes other than those for which he was authorized, and this violates the maxims of both *Wilson* [*In re Wilson*, 81 *N.J.* 451, 409 *A.*2d 1153 (1979) ] and *In re Hollendonner*, 102 *N.J.* 21, 504 *A.*2d 1174 (1985)."

In its review of the matter, the DRB agreed with the findings of the Master. It emphasized the "great distress and enormous economic injury" that respondent caused the DuPonts and concluded that "no amount of reparation may ever be sufficient to redress the harm visited on them." The DRB found knowing misappropriation as to the disposition of both James' and Robert, Jr.'s funds. First, it concluded that the $230,000 credit (in the form of two building lots) due to the sons was improperly passed on to Cranberry. It then found that respondent knowingly misappropriated the cash and value from James' closing when he

permitted Cranberry to keep the closing proceeds without advancing corresponding cash to make up the shortfall at closing. Finally, the DRB concluded that in the case of Robert, Jr. and Cecelia, respondent made unauthorized use of funds entrusted to him by applying them towards the James and Yolanda property, and, even more importantly, to other Cranberry obligations that were unrelated to the transaction.

■ We disagree that the transfer of lots 6.01 and 6.02 to Cranberry constituted a misappropriation of client funds. The transfers of the lots were necessary to effectuate the planned land exchange. Moreover, the title to the lots had been transferred to Cranberry's name even before the September 30, 1988, transfer of the Kayhart Farm.

■ The more difficult questions are whether the use of James' funds to pay only part of the Kenvil mortgage and the use of Robert, Jr. and Cecelia's funds to satisfy James and Yolanda's liens constitutes a knowing misappropriation of client funds.

> Misappropriation is "any unauthorized use by the lawyer of clients' funds entrusted to him, including not only stealing, but also unauthorized temporary use for the lawyer's own purpose, whether or not he derives any personal gain or benefit therefrom." *In re Wilson,* 81 *N.J.* 451, 455 n.1, 409 *A.*2d 1153 (1979). As we stated in *In re Noonan,* 102 *N.J.* 157, 506 *A.*2d 722 (1986), knowing misappropriation "consists simply of a lawyer taking a client's money entrusted to him, knowing that it is the client's money and knowing that the client has not authorized the taking." *Id.* at 159–60, 506 *A.*2d 722.
>
> [*In re Sommers,* 114 *N.J.* 209, 221, 553 *A.*2d 789 (1989).]

Whether respondent's conduct constituted a "knowing misappropriation" is on this record a troubling question. In a literal sense, respondent misused his clients' closing funds. However, subsequent judicial proceedings confirmed that respondent relied on Kenvil's representations that respondent's disposition of the mortgage proceeds would clear both titles. *See In re Hecker,* 109 *N.J.* 539, 538 *A.*2d 354 (1988) (explaining effect in disciplinary proceedings of collateral civil findings). Were it not, as stated by the Special Master, that "respondent appeared to regard the separate James/Yolanda and Robert, Jr./Cecelia transactions as

part of a single unified deal," we would find a knowing misappropriation of clients' funds that under *In re Wilson, supra,* 81 *N.J.* 451, 409 *A.*2d 1153, warrants disbarment. It was at least reasonable for respondent to regard the exchange as a single transaction with multiple parts. And, as the Special Master also determined, respondent's intent was not malicious and the "misapplication" of his clients' funds was based on his expectation that Kenvil would release its liens in exchange for the stipulated payments for the mutual benefit of his clients. Had respondent prior to the closings adequately secured Kenvil's agreement to release its liens, his otherwise irregular disposition of the closing funds would have been entirely appropriate, which suggests that malpractice rather than misappropriation is at the root of this record. The Chancery Division determined that Kenvil, despite its prior agreement, had refused wrongfully to discharge its mortgage liens, and had slandered the title of the buyers, and the court therefore assessed punitive damages against Kenvil, as it did against respondent. The record before the Chancery Division demonstrates that respondent and Cranberry, respondent's longtime client, continued at all times to attempt to meet Kenvil's demands for additional funds in order to remove the liens from the properties purchased by the DuPont sons.

We read the record to conclude that Kenvil not only misled Ferry and respondent at the January 1990 post-closing meeting, as the Chancery Division found, but also misrepresented its intentions in September 1988 and May 1989, when it told Ferry what it would require to release its liens on both lots. So read, respondent's misdeeds are more sins of neglect than avarice. If respondent honestly believed that Ferry had Kenvil's agreement in September 1988 (when he closed lot 6.02 for James and Yolanda) to release its lien on lot 6.02 for $100,000, then respondent's inaccurate RESPA statement and incorrect certifications to the title company and purchase money mortgagee were irresponsible rather than fraudulent. Respondent assumed that Kenvil would keep its word. (Respondent had cleared Kenvil liens in the past on the basis of oral assurances.) Respondent should have

secured the arrangement by requiring Kenvil to endorse for cancellation its mortgage on lot 6.02, subject only to payment of $100,000 and delivery of equivalent collateral. Had he done so, respondent's disposition of the closing proceeds, preparation of the RESPA statement and certifications to the purchaser's bank and title company would have been entirely appropriate. When Kenvil did not honor its promise, however, respondent's failure to disclose the problem to all parties compounded his already inexplicable and egregious misconduct.

Similarly, if respondent believed Ferry in May 1989 that Kenvil would release its lien on lot 6.01 if the loan on lot 6.02 and all other interest were paid in full, and, if respondent had protected the DuPonts by requiring Kenvil to deliver the mortgages endorsed for cancellation before he tendered those payments, then respondent's payments to Kenvil and to Cranberry out of those closing proceeds would not have been improper. From that perspective, his misapplication of the second closing's proceeds again was more a matter of professional incompetence than of misappropriation of funds. And if respondent properly had secured Kenvil's compliance with its arrangement with Ferry, there would have been no misuse of client funds. Thus, the question posed is whether respondent was a rogue or a too trusting and very sloppy lawyer.

Finally, if Kenvil had honored the promise that the Chancery Division found it had made in January 1990, to release the liens for $200,000 in additional cash, this matter might never have been before us. Respondent and Ferry raised the cash, and Kenvil breached its commitment and applied the money to other lots, resulting in a foreclosure action that *took four years to resolve,* and led to these disciplinary proceedings. From that perspective, Kenvil's dishonesty, even more than respondent's incompetence, was the primary cause of the DuPonts' difficulties.

But there is more to this case than whether the handling of the closing proceeds was a misappropriation of client funds. The DRB concluded that "even if this conduct were found not to be, strictly speaking, knowing misappropriation, respondent's de-

ceitful conduct was so egregious that he should suffer the same consequences attached to conduct involving knowing misappropriation." Based on our independent review of the record, we too find clear and convincing evidence of the commission of multiple offenses. Respondent engaged in an impermissible conflict of interest, in violation of *RPC* 1.7(b) and (c), by his representation of the seller and two separate sets of purchasers when his own pecuniary interest materially limited his ability to counsel his clients. He failed fully to disclose and explain the nature of the conflict to the respective purchasers and lenders and made no effort to obtain their express consent to his multiple representation, in violation of *RPC* 1.7(b). He failed to safeguard client funds and he failed to deliver those funds to third persons entitled to receive them, in violation of *RPC* 1.15(a) and (b). And, finally, he engaged in a pattern of deceit and dishonesty and made numerous misrepresentations, both to his clients and to third persons, in violation of *RPC* 8.4(c).

The question is whether this conduct requires disbarment. The cases in which we have disbarred lawyers for conduct other than knowing misappropriation have involved misconduct more venal than that displayed by respondent. *See, e.g., In re Goldberg,* 142 *N.J.* 557, 666 *A.*2d 529 (1995) (disbarring attorney convicted of mail fraud and conspiracy to defraud the United States); *In re Ort,* 134 *N.J.* 146, 631 *A.*2d 937 (1993) (disbarring attorney who had withdrawn fees from estate account without authorization, knowingly misrepresented value of services, prepared deceitful time records, and charged excessive and unreasonable fees); *In re Messinger,* 133 *N.J.* 173, 627 *A.*2d 162 (1993) (disbarring attorney convicted of several serious federal charges involving income tax fraud and conspiracy); *In re Jones,* 131 *N.J.* 505, 621 *A.*2d 469 (1993) (disbarring attorney who solicited bribe while a public official for his own personal gain); *In re LaRosee,* 122 *N.J.* 298, 585 *A.*2d 326 (1991) (disbarring attorney who engaged in forgery of public documents and encouraged former client to present false testimony); *In re Zauber,* 122 *N.J.* 87, 583 *A.*2d 1140 (1991)

(disbarring attorney convicted of RICO conspiracy, soliciting kick-backs in connection with employee benefit plan, forgery, and obtaining prescription drugs by fraud or misrepresentation); *In re Spina,* 121 *N.J.* 378, 580 *A.*2d 262 (1990) (disbarring attorney who knowingly misused substantial amounts of employer's funds for personal use); *In re "X",* 120 *N.J.* 459, 577 *A.*2d 139 (1990) (disbarring attorney who engaged in repeated acts of sexual assault on his three minor daughters over eight year period); *In re Cohen,* 120 *N.J.* 304, 308, 576 *A.*2d 855 (1990) (disbarring attorney previously suspended from practice of law for "his numerous ethical infractions, [and] his continuous unresponsive and uncooperative attitude towards his clients, the courts, and the entire disciplinary system"); *In re Lunetta,* 118 *N.J.* 443, 572 *A.*2d 586 (1989) (disbarring attorney who pled guilty to conspiracy to receive and sell stolen securities); *In re Yaccarino,* 117 *N.J.* 175, 564 *A.*2d 1184 (1989) (disbarring former judge who suborned perjury and conspired to acquire property belonging to litigants); *In re Spagnoli,* 115 *N.J.* 504, 559 *A.*2d 1352 (1989) (disbarring attorney who accepted retainer fees from 14 clients without ever intending to represent them, lied to court, and failed to cooperate in ethics proceedings); *In re Edson,* 108 *N.J.* 464, 530 *A.*2d 1246 (1987) (disbarring attorney who counseled client to fabricate defense involving knowingly false material facts, and knowingly permitting client to offer false evidence at trial); *In re Conway,* 107 *N.J.* 168, 526 *A.*2d 658 (1987) (disbarring attorney convicted of conspiracy to obstruct justice by tampering with witness); *In re Rigolosi,* 107 *N.J.* 192, 526 *A.*2d 670 (1987) (disbarring attorney collaterally involved in conspiracy to bribe witness to secure dismissal of criminal charges); *In re Baldino,* 105 *N.J.* 453, 522 *A.*2d 998 (1987) (disbarring attorney convicted of conspiracy to commit official misconduct by subverting member of grand jury); *In re Goldberg,* 105 *N.J.* 278, 520 *A.*2d 1147 (1987) (disbarring attorney who actively participated in conspiracy to distribute narcotics); *In re Surgent,* 104 *N.J.* 566, 518 *A.*2d 215 (1986) (disbarring attorney convicted of conspiracy to commit theft by deception and 14 felony offenses including conspiracy, securities

fraud, mail fraud, wire fraud, sale of unregistered securities, and subornation of perjury); *In re Tuso*, 104 *N.J.* 59, 514 *A.*2d 1311 (1986) (disbarring attorney convicted of conspiracy to commit bribery and solicitation of misconduct and two counts of offering bribe to public official).

On the other hand, respondent's misconduct was severe and warrants substantial discipline. In cases of misrepresentation, the Court has imposed a range of discipline, taking into consideration the severity of the misconduct and the existence of aggravating and mitigating factors. For example, the Court has suspended for three years an attorney who misrepresented to the court allegations in his own personal injury suit, *In re Lunn*, 118 *N.J.* 163, 570 *A.*2d 940 (1990); has suspended for three years an attorney who filed a false certification in a civil matter to induce a court to grant relief for the attorney's own benefit, *In re Kushner*, 101 *N.J.* 397, 502 *A.*2d 32 (1986); has suspended for two years an attorney who forged the name of the sheriff on a deed of foreclosure, witnessed the forged instrument and later recorded it, *In re McNally*, 81 *N.J.* 304, 406 *A.*2d 1315 (1979); has suspended for one year an attorney who made a knowingly false statement in a deposition in a civil matter in which the attorney was the plaintiff, *In re Schleimer*, 78 *N.J.* 317, 394 *A.*2d 359 (1978); and suspended for three months an attorney who fabricated and submitted a motor vehicle insurance card in defense of a charge of driving without insurance, *In re Poreda*, 139 *N.J.* 435, 655 *A.*2d 439 (1995).

Respondents's numerous misrepresentations to clients, banks and title companies warrant severe discipline. "Candor and honesty are a lawyer's stock and trade. Truth is not a matter of convenience. Sometimes lawyers may find it inconvenient, embarrassing or even painful to tell the truth. . . . Absolute candor coupled with an absolute duty to disclose, no matter how painful, is required." *In re Whitmore*, 117 *N.J.* 472, 477–78, 569 *A.*2d 252 (1990) (citation omitted). Respondent gravely erred in failing to disclose his own mistakes and in attempting to correct them without notifying the affected parties. His issuance of an inaccu-

rate RESPA statement and title certifications at the first closing, and his unauthorized application of funds from the second closing, without securing in advance the mortgage discharges, constituted gross negligence. His subsequent failure to disclose that misconduct was similarly egregious. We do not find in this record, however, clear and convincing evidence either of knowing misappropriation or of conduct so venal as to persuade us that respondent should never again be permitted to practice law. While respondent benefitted from the deal by acquiring the Kayhart Farm, he did meet or exceed all requirements imposed on him under the contract. Thus, although he acted, as the Special Master found, with a "clear self interest," and did "profit personally" from the deal, he derived no unfair advantage from the transactions. We note also that respondent has been a member of the bar since 1970, with no prior history of ethics violations.

Nonetheless, this case stands as a stark reminder to the bar. An attorney may only use client funds for purposes authorized by the client. An attorney may not assume that a client would, if asked, approve an otherwise unauthorized use of funds. An attorney must obtain and follow the client's instructions before using the client's funds for previously unauthorized purposes. But for the inter-relationship between these transactions that rendered the use of the separate funds as dispositions for each client's mutual purposes, respondent would be subject to disbarment.

We order that respondent be suspended for a period of three years. Respondent shall also arrange to satisfy the judgment for punitive damages in favor of his clients. We also impose on respondent the obligation to reimburse the Disciplinary Oversight Committee for appropriate administrative costs.

So ordered.

*For suspension*—Chief Justice PORITZ, and Justices POLLOCK, O'HERN, GARIBALDI, STEIN and COLEMAN—6.

*Opposed*—None.·

## ORDER

It is ORDERED that **F. WILLIAM LA VIGNE** of **AND-OVER**, who was admitted to the bar of this State in 1970, is hereby suspended from the practice of law for a period of three years, effective December 9, 1996, and until the further Order of the Court; and it is further

ORDERED that respondent arrange to satisfy the judgment for punitive damages in favor of his clients; and it is further

ORDERED that respondent be restrained and enjoined from practicing law during the period of his suspension and that he comply with *Rule* 1:20–20, which governs suspended attorneys; and it is further

ORDERED that the entire record of this matter be made a permanent part of respondent's file as an attorney at law of this State; and it is further

ORDERED that respondent reimburse the Disciplinary Oversight Committee for appropriate administrative costs incurred in the prosecution of this matter.

APPENDIX

**Step 1**: DuPont, Sr. to LaVigne
September 30, 1988

DuPont, Sr.    LaVigne
Keyhart Farms  K Price = $175k
FMV = $405k  ($50k paid off outstanding mortgage on farm, $125k held in trust by LaVigne for DuPont sons)

$405k (FMV)
- $175k (stated K price)
$ 230k (to be credited to DuPont sons in the form of two residential building lots being developed by Cranberry Builders, which was affiliated with LaVigne)

**Step 3**: Cranberry had secured construction financing by giving mortgages on lots 6.01 & 6.02 to Kenvil (essentially its lumber supplier)

6.01: $200k loan   6.02: $200k loan

**Step 2**: How LaVigne arranges for credits to be applied to DuPont sons

6.01 → To Cranberry free and clear ($115k credit to Robert, Jr./Cecelia DuPont)

6.02 → To Cranberry subject to $100k mortgage paid to Sussex so it would release lots 6.01 & 6.02 from its $300k blanket mortgage on LaVigne's 8 lots ($115k credit to James/Yolanda DuPont)

Lot 5 → To Cranberry to cover Sussex debt

**Step 4**: Cranberry to James and Yolanda DuPont
September 30, 1988

6.02 with house

FMV = $318,900 - $115k (credit for lot) = $203,900 (stated K price)
$203,900 - $62,500 (held by LaVigne)= balance paid by $155k mortgage (from Nat'l Community Bank of NJ)

Major Disbursements

$112k (includes interest) to pay off Sussex
$100k paid to Kenvil by checks to and from Cranberry

**Step 5 :Cranberry to Robert, Jr. and Cecelia DuPont**
May 25, 1989

6.01 with house

FMV – $339k - $115k (credit for lot) = $224k (stated K price)
$ 224k - $62,500 (held by LaVigne) – balance paid by $165k mortgage
(from Nat'l Community Bank of NJ)

**Major Disbursements**

$117k paid to Kenvil by LaVigne on behalf of Cranberry to satisfy the balance of Kenvil's lien on lot 6.02.
An additional $22k is paid to Kenvil to cover interest due on other Cranberry properties in expectation that Kenvil would release its lien on 6.02, and transfer its lien on 6.01 to other Cranberry projects.

**Step 7 :Liens released**

After litigation is commenced, the Superior Court orders the release of Kenvil's liens against 6.01 & 6.02 and assesses punitive damages against Kenvil ($25k to James/Yolanda, $10k to Robert, Jr./Cecelia) and against LaVigne ($25k to James/Yolanda; $25k to Robert, Jr./Cecelia).

FMV – Fair market value
K = Contract
k = Thousands

**Step 6 :Kenvil refuses to release liens on either 6.01 or 6.02**

Despite payment of an additional $200,000 by Cranberry ($104k) and LaVigne ($96k), Kenvil still refuses to release the properties.

ii